FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
* APRIL 30, 2025 *
BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

Plaintiffs 1-3, on behalf of themselves and
all others similarly situated,

                         Plaintiffs,

       v.

THE CITY OF NEW YORK; JESSICA S.
TISCH, Police Commissioner for the City
of New York, in her official capacity;
JOSEPH KENNY, Chief of Detectives for
the New York City Police Department, in
his official capacity; and JOHN HART,
Assistant Chief of Intelligence for the New
York City Police Department, in his
official capacity,

                         Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**CLASS ACTION**
**COMPLAINT**

25 -CV- 2397
Judge Brian M. Cogan

---

## PRELIMINARY STATEMENT

1.     This class action seeks to end the New York City Police Department's ("NYPD"
or "Department") unconstitutional practice of disparately criminalizing and targeting tens of
thousands of Black and Latino New Yorkers by placing their names in the Department's Criminal
Group Database ("Database" or "Criminal Group Database"). The NYPD uses the Database to
label New Yorkers arbitrarily as "criminal group members," otherwise referred to as so-called
"gang" or "crew" members, then disseminates that label widely throughout the Department,
leading officers to surveil, detain, and interrogate those targeted in violation of the First, Fourth,
and Fourteenth Amendments to the United States Constitution, the New York Constitution, and
the New York City Administrative Code.

2.      People on the Database live in constant fear of police harassment. NYPD targeting has profoundly injured their interpersonal and intimate relationships, causing them to distance themselves from friends and family, to restrict their online speech, and even to stop bringing their own children to the playgrounds in and around their homes out of fear they will be spied on, harassed, arrested, or worse.

3.      Policies and practices related to the Database harm Black and Latino people almost exclusively. Of the roughly 13,200 people listed as "active" members of a criminal group in the Database as of 2025, 99% are Black and/or Hispanic.[1] Less than 1% are white. Most are young men and boys, some as young as thirteen. At one point, the Database included two children who were eleven years old. The racial disparities extend to people who are labeled as "inactive" members of criminal groups—the NYPD maintains information collected for these individuals on the Database, even after changing their designation. As of 2025, Black and Hispanic people accounted for 96.84% of the roughly 14,100 people listed as "inactive" on the Database.

4.      These extreme racial disparities are well-known and intentional. The NYPD designed the Database and its related policies and practices to target young Black and Latino men and boys based on their race and ethnicity, their constitutionally-protected relationships, and their speech. And the Department continues to selectively implement and enforce these policies and

---

[1] This complaint uses the term "Latino," except where it relies on data from the NYPD, the Census, or the American Community Survey. When the allegations rely on those sources, it uses the term "Hispanic." "Hispanic" and "Latino," while often used interchangeably, mean different things. "Hispanic" refers to individuals who originate from Spanish-speaking countries, including Spain. *See* 42 USC § 300u-6(g)(2). "Latino," meanwhile, refers to individuals whose origins are from Latin America, which includes Mexico, Central America, and South America. *See* Mark Hugo Lopez et al., *Who is Hispanic?*, Pew Resch. Ctr. (Sep. 12, 2024), https://www.pewresearch.org/short-reads/2024/09/12/who-is-hispanic/. Latinos can be of any race. The term includes Afro-Latinos and Indigenous people who self-identify as Latino. In using both terms throughout this complaint, Plaintiffs are not implying interchangeability but are instead simply recognizing that the cited references use one or the other of these terms.

practices against Black and Latino people today. For these reasons, the severity of the racial disparities in the Database has remained constant, even as advocates and lawmakers raised concerns that the Database is a form of racial profiling.

5.      The Database is not the first racially discriminatory policing tactic the NYPD has deployed against Black and Latino New Yorkers: it is the latest chapter in the NYPD's history of unconstitutional and discriminatory policing. In 2013, a federal district court ruled that the NYPD's Stop, Question, and Frisk ("Stop and Frisk" or "SQF") policy and practices violated the Fourth and Fourteenth Amendment rights of thousands of Black and Latino New Yorkers. The NYPD is still under court supervision for these widespread constitutional violations and, even after a decade, has failed to substantially comply with the court orders, especially with respect to the intentional discrimination violations. Instead, the Department has used the Database as one tactic to achieve the same unlawful goals.

6.      The Database replicates and deepens the racial disparities of the NYPD's unconstitutional SQF practices and recycles the very racial-profiling tactics driving those disparities. The NYPD continues to maintain, encourage, and sanction the use of the Database to disparately track, surveil, and harass Black and Latino New Yorkers and neighborhoods under the guise of "gang policing."

7.      The NYPD maintains no consistent or public definition of what constitutes a "criminal group" for the purposes of the Database. Nor does the NYPD require that someone be suspected of committing any crime before the Department labels them as a "criminal group"

member. Instead, the NYPD relies on vague and broad criteria to determine whether to add someone to the Database and thereby subject them to racial profiling.

8.      The NYPD trains officers to designate people as "criminal group members" based on their race, ethnicity, national origin, and stereotypes associated with each of these protected characteristics. For example, training materials instruct officers to designate people as members of so-called "gangs" and "crews" based on "Mexican tattoos," cultural touchstones such as common gestures used by Black athletes, or simply being present at the Puerto Rican Day parade.

9.      The NYPD labels Black and Latino youth as "criminal group members" for behavior that white New Yorkers likewise engage in with their neighborhood friend groups and fraternities without similar suspicion of criminal activity. Moreover, the NYPD excludes from the Database white people and predominantly white "groups" that the Department knows or suspects to engage in criminal activity, including the Proud Boys and Russian and Albanian criminal organizations.

10.      The NYPD relies on race to apply its broad criteria. In identifying "criminal group members," the NYPD draws a line between what it refers to as "street gangs"—whose alleged members include large swaths of Black and Latino communities—and non-Black and non-Latino entities, including "traditional" organized crime.

11.      Plaintiffs 1-3, pseudonymously called "Adam Anderson," "Bryan Bradley," and "Chris Cooper," respectively, are all Black men who were born and raised in New York City. The NYPD added Plaintiff Adam to the Database shortly after his twenty-first birthday; Plaintiffs

Bryan and Chris were added when they were still teenagers. Adam, Bryan, and Chris have never been a member of any group whose purpose was to commit any crime.

12.     Roughly a decade after adding each of them to the Database, the NYPD lists Adam and Chris as "active" members of criminal groups. Bryan was deactivated after roughly seven years and placed on a list of "inactive" criminal group members. These NYPD designations remain despite changed residences, transitions to fatherhood, and, for Chris, employment with the Fire Department of New York as an Emergency Medical Technician.

13.     Because the NYPD has labeled them as criminal group members in the Database, Plaintiffs experience or risk persistent surveillance and harassment by officers. Officers stop Plaintiffs Adam and Bryan for low-level infractions such as jaywalking, littering, or traffic offenses that the NYPD often ignores for people not on the Database. NYPD officers stop Plaintiffs Adam and Bryan as often as once a month, frequently within blocks of their current or childhood homes. After stopping them, these officers subject both men to erroneous and invasive interrogations regarding unrelated people and events in their communities. Rather than promptly releasing Plaintiffs Adam and Bryan with a summons, traffic ticket, or appearance ticket, NYPD officers routinely and unreasonably detain both young men in police precincts for hours for the sole purpose of that questioning.

14.     Even after Plaintiff Bryan was placed on the "inactive" list, the NYPD has continued to subject him to law enforcement actions based on the Database, including surveillance, harassment, prolonged detention, and interrogation. And in paperwork stemming from these law

enforcement actions, the NYPD has continued to label Bryan as a "known gang member," even though he has never been a member of any criminal group.

15.    All three young men have taken extraordinary and burdensome measures to avoid this police harassment and the prolonged detentions that follow. Plaintiff Chris avoids his former neighborhood and home as much as possible, including by limiting visits to his grandfather who is unable to leave his home due to mobility restraints. Though Chris avoids returning home, during two separate routine traffic stops outside of his childhood community, Chris has been identified by officers as a member of a gang. In one instance when he was merely a passenger in a company car driven by his coworker, Chris was singled out for a search after officers discovered he was on the Database. The officers ultimately arrested him and detained him for charges that were later dismissed.

16.    Adam and Bryan miss community gatherings, avoid public spaces such as courtyards or basketball courts, and minimize time outside of their homes for days at a time. Adam and Bryan, who are both fathers, no longer feel comfortable bringing their young children to their local playgrounds. Because of the NYPD's unconstitutional Database practices, each of these men have been deprived of spending time with friends, neighbors, and family members. They have had to sacrifice these freedoms for fear that the NYPD will harass or detain them because of how they have been labeled. They also fear the NYPD will add their friends or family members to the Database because of mere proximity and association. Bryan further fears that the NYPD will move him back to the "active" list of criminal group members.

17.    Named Plaintiffs are far from alone. Their stories are echoed by countless New Yorkers on the Database who face the same suffocating police scrutiny and disruptive tactics each day. Putative class members are targeted and added to the Database, leading to surveillance, monitoring, and harassment by police, for engaging in daily life: spending time with family, attending social events and cultural celebrations, liking a post on social media, having tattoos of initials, or posting a photo with friends on the local basketball court. Some, including children, are stopped on their walks home from school and asked for permission to search their bookbags. Others avoid the neighborhoods where they grew up, missing out on time with family to escape the harassment that has shaped their young lives.

18.    For each of these reasons, named Plaintiffs Adam, Bryan, and Chris on behalf of themselves and a class of similarly situated individuals, seek injunctive and declaratory relief to end the discrimination and harm caused by these NYPD policies and practices, which violate their rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State and City of New York.

## PARTIES

### I.    *Plaintiffs*

19.    Plaintiff 1, referred to by the pseudonym "Adam Anderson," is a 31-year-old Black man. He currently resides in Bedford-Stuyvesant, Brooklyn, where he was born and raised. Adam grew up in Sumner Houses, a New York City Housing Authority ("NYCHA") property located in Bedford-Stuyvesant, where his family continues to reside. Adam is the father of a son, age 9, and

daughter, age 7. He has been labeled as a "criminal group member" by the NYPD and is confirmed to be on the Database's "active" list. Adam is subject to the NYPD policies challenged herein and has suffered injuries as a result.

20.     Plaintiff 2, referred to by the pseudonym "Bryan Bradley," is a 27-year-old Black man. He currently resides in Mariner's Harbor, Staten Island. Bryan grew up in Mariner's Harbor Houses, a NYCHA property located on Staten Island, where his family continues to reside. Bryan is the father of four daughters, ages 10, 3, 10 months, and nearly two weeks. The younger three of his children live in Mariner's Harbor. He has previously been labeled as an "active" member of a criminal group by the NYPD, and on information and belief, Bryan is currently on a list of "inactive" criminal group members maintained by the NYPD as part of the Database. Bryan continues to be labeled as a "criminal group member," continues to be subject to the NYPD policies challenged herein, and has suffered injuries as a result.

21.     Plaintiff 3, referred to by the pseudonym "Chris Cooper," is a 28-year-old Black man. He currently resides in East Flatbush, Brooklyn. Chris previously lived with his grandparents in Gowanus Houses in Brooklyn, where his grandfather still resides. He is an Emergency Medical Technician with the FDNY and wants to be a firefighter. He has been labeled as a "criminal group member" by the NYPD and is confirmed to be on the Database's "active" list. Chris is subject to the NYPD policies challenged herein and has suffered injuries as a result.

## II.     *Defendants*

22.     Defendant City of New York ("City") is a municipal entity duly incorporated and existing under the laws of the State of New York. It acts under the color of state law and is

authorized under the laws of the State of New York to maintain a police department, the NYPD, which acts as its agent in the area of law enforcement. The City is responsible for the policies, customs, widespread practices, hiring, training, and supervision of the NYPD and for ensuring that NYPD personnel obey the laws and constitutions of the United States, the State of New York, and the City of New York.

23.     Defendant Jessica S. Tisch is the Police Commissioner of the City of New York. As Commissioner, Tisch has final policymaking authority with respect to the NYPD. She is sued in her official capacity.

24.     Defendant Joseph Kenny is the Chief of Detectives of the NYPD. As Chief of Detectives, Kenny manages and sets policy for the NYPD's Detective Bureau and its specialized divisions, including the gang squad detectives that monitor social media to identify members of gangs and crews and recommend people for entry into the Database, and the Real Time Crime Center that reviews and approves recommendations for entering someone into the Database. He is sued in his official capacity.

25.     Defendant John Hart is the Assistant Chief of the Intelligence Bureau of the NYPD. As Assistant Chief of Intelligence, Hart manages and sets policy for the NYPD's Intelligence Bureau, including the Field Intelligence Officer program, where ranking uniformed officers deployed to each NYPD precinct collect and disseminate intelligence on criminal groups and recommend people for entry into the Database. He is sued in his official capacity.

## JURISDICTION & VENUE

26.     Jurisdiction is conferred upon this Court under 42 U.S.C. § 1983 and 28 U.S.C. § 1331, as this action seeks redress for the violation of Plaintiffs' federal constitutional and civil rights.

27.     Jurisdiction is proper over Plaintiffs' New York City and State law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

28.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTS

### I.     *The NYPD Created a Secret Database Designed to Continue Unlawful Stop and Frisk Policies Under a Different Guise.*

29.     Since at least 2013, the NYPD has operated the current iteration of the Database: a centralized, electronic database, which it uses to label people as "gang" or "crew" members to justify the surveillance and targeted enforcement measures the NYPD uses against them.

30.     As early as 2001, the NYPD maintained and used smaller databases to label, track, and monitor alleged gang members. On information and belief, the Database was populated using information previously aggregated by the NYPD through the Department's "Intelligence Division" and stored in a predecessor database.

31.     Through the current iteration of the Database, the NYPD replicates and expands many of the same discriminatory practices under its Stop, Question, and Frisk program, which were deemed unconstitutional by a federal court in 2013.

32.     Years into the Stop and Frisk litigation, and shortly before a federal court ruled the NYPD's practices discriminatory and unconstitutional, the NYPD expanded its gang unit, including by deploying additional teams of officers to use the Database to monitor the social media of those targeted for entry into the Database and surveil those already in the Database. According to then-NYPD Commissioner Raymond Kelly, the NYPD focused these resources on "crews" or "looser associations of younger men who identify themselves by the block they live on, or on which side of a housing project they reside" as targets.[2]

33.     In 2018, news outlets reported, for the first time, that the total number of people listed as "active" on the Database had increased by 70% since January 2014 and that of the people added, 99% were Black and/or Latino.[3]  The reporting relied on data obtained through a public records request, which the NYPD produced in March 2018.[4] The data showed that the NYPD had added a total of 44,940 people to the Database between 2001 and 2018.[5]

---

[2] Int'l Ass'n.of Chiefs of Police, 2012 2d Gen. Session, *Raymond Kelly at IACP 2012*, at 6:07, YouTube, (Oct. 2, 2012), https://www.youtube.com/watch?v=YCsr0RS5o9U.

[3] Alice Speri, *New York Gang Database Expanded by 70 Percent Under Mayor Bill de Blasio*, THE INTERCEPT (June 11, 2018 10:49 am) https://theintercept.com/2018/06/11/new-york-gang-database-expanded-by-70-percent-under-mayor-bill-de-blasio/.

[4] *Id.*

[5] Tr. of Testimony of Professor Babe Howell, New York City Council Hearing of the Public Safety Committee, Oversight – NYPD's Gang Takedown Efforts, at 128:4-21 (June 13, 2018), available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3506401&GUID=43D779AF-FAC6-4122-9886-87F19EAE5CC6&Options=&Search=uncil - File #: T2018-2108.

34.     The NYPD also maintains as part of the Database a list of people who were once labeled as "active" members of a criminal group but are now deemed "inactive."

35.     Following public protests and demands for transparency about the NYPD's policies and practices related to the Database, the New York City Council held a hearing in June 2018 about the Database.

36.     In the three months between the NYPD's March 2018 production of data regarding the nearly 45,000 people on the Database and the NYPD's public testimony in June 2018, the NYPD purged tens of thousands of people from the Database.

37.     During that hearing, Dermot Shea, then the NYPD Chief of Detectives, testified that, as of the date of the hearing, the NYPD tracked 17,500 people as "active" criminal group members on the Database and that the "racial breakdown" of the "active" list of the Database was "extremely disparate." Shea also described publicly, for the first time, what he referred to as the "criteria" that the Department designed to label people as criminal group members and track them in the Database.

38.     Prompted by the public's concerns, in October 2018, the Office of the Inspector General for the NYPD ("OIG" or "Inspector General"), a watchdog agency responsible for investigating the NYPD's policies and practices, launched an investigation into the NYPD's operation of the Database.

39.     Due to continued concerns over the Database and other police surveillance technologies, in 2020, the City Council passed the Public Oversight of Surveillance Technology ("POST") Act, a transparency law requiring the NYPD to publish an Impact and Use Policy that

provides certain information about the capabilities of, and Department policies for, its surveillance technologies.

40. Pursuant to the POST Act, in 2021, the NYPD published for the first time some of its criteria for entry into the Database as part of the "Impact and Use Policy" for the Database (the "2021 IUP").

41. In April 2023, the OIG issued a report ("OIG Report"), which included the most comprehensive information about the Database to date. The OIG Report detailed system-wide breakdowns and deficiencies with the NYPD's design and operation of the Database, including deficient policies for labeling someone as a member of a "criminal group," as described in the IUP and other documents.

## II.   *Vague and Arbitrary Criteria and Definitions Create Racial Disparities and Enable Racial Profiling.*

42. The NYPD developed criteria for entry into the Database to facilitate continued profiling of the same communities it targeted under Stop and Frisk.

43. The NYPD's criteria for adding groups and people to the Database—both as described in its Impact and Use Policies and as carried out through formal and informal policies, guidance, and training documents—are vague and lack sufficient specificity.

44. Taken all together, the criteria, policies, guidance, and training related to the Database are contradictory, confusing, and, at times, contrary to public testimony and statements by the NYPD.

45. The NYPD has no consistent or clear definition of what constitutes a "criminal group," leaving people uncertain as to whether the NYPD may label any social association as one.

The NYPD uses this vagueness and lack of specificity—and trains officers to use this vagueness and lack of specificity—to target Black and Latino people and groups arbitrarily and without adequate cause.

46.    The NYPD's criteria for determining which people are members of these "criminal groups" are similarly broad and vague. As a result, NYPD officers are empowered to arbitrarily label people as members of such groups. In operation, the NYPD uses this discretion to engage in racial profiling.

47.    Despite the OIG's critique of many of the NYPD's Database Policies, the NYPD has failed to adopt many of the OIG's recommendations or otherwise resolve the problems the OIG identified in its report.

### A. The NYPD Does Not Clearly Define "Criminal Group," Giving Officers Unfettered Discretion.

48.    The NYPD defines the terms "criminal group," "gang," and "crew" in a piecemeal manner that is inconsistent across the Department's public statements and internal documents related to the Database.

49.    In its 2021 IUP, the NYPD describes the Database as a repository for information about "criminal groups and street gangs."

50.    However, neither the 2021 IUP nor the corresponding "Activation DD5," an electronic form that officers must complete to recommend someone for entry in the Database, define either a "criminal group" or "street gang."

51.    In public testimony in February 2025, the NYPD was not able to provide a clear definition of "criminal group," even when specifically asked to provide such definition.

52. The name "Criminal Group Database" is a vague misnomer because the NYPD tracks groups in the Database without a prior finding that the groups' members regularly have engaged in or regularly are engaging in criminal activity of any kind, let alone criminal activity carried out by the group.

53. The Department has labeled as "criminal groups" in the Database, so-called groups that, according to the NYPD, have only a single member.

54. In one set of training materials for the Database, the NYPD defines "criminal group" as "[a] group of persons with a formal or informal structure that includes designated leaders and members, that engage in or are *suspected* to engage in unlawful conduct" (emphasis added).

55. The NYPD does not define how much evidence, or what level of suspicion, is required for a group to satisfy this definition and thus be tracked in the Database.

56. In other training documents, the NYPD defines "criminal group" as synonymous with "gang" and "crew." But the NYPD's definitions of "gang" and "crew" further reveal that purported "criminal groups" are not actually criminal.

57. For purposes of the Database, the NYPD inconsistently defines the term "gang" with some definitions conditioned on "criminal activity" and others not. For example, in its Patrol Guide, the NYPD defines "gang" as "[a]ny ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities, the commission of one or more criminal acts (including drug dealing), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." By contrast, one NYPD training defines "youth

gang" as "generally comprised of adolescents" and as an "identifiable group who have engaged in unlawful or *anti-social activity*, verifiable by police records or reliable sources" (emphasis added).

58.     Some internal NYPD Database materials define "crew" as "[a] group of people associating or classed together: company, set, team, dance group, gang, etc." Publicly, the NYPD has testified that "crews" are "smaller groups linked either by their residence or by the schools they attend" and that crews "lack . . . a defined structure."

59.     By providing inconsistent definitions and conflicting guidance for the term "criminal group," the NYPD gives officers license to use racial bias to determine what is and is not a "criminal group."

60.     Based on these vague definitions of "gang" and "crew," the NYPD gives its personnel near limitless discretion to label any group of people a "criminal group," including high school dance squads or sports teams. Indeed, the NYPD labeled thousands of people as members of a "criminal group" in the Database using criteria that often rely on vague references to a person's speech, housing location, and relationships.

**B. The 2021 IUP and Related Activation Criteria for Entry into the Database Are Vague.**

61.     In the 2021 IUP, the NYPD published some of the criteria it purports to use for labeling a person as a "criminal group" member. The Department lists additional criteria for entry into the Database in the Activation DD5.

62.     Based on the 2021 IUP and Activation DD5, the NYPD entered people in the Database when they met the following criteria:

**Option A** (one of the following is required for entry):

(1) a self-admission of criminal group membership to a member of the NYPD; or social media posts admitting to membership in a criminal group, "such as language, symbols, picture[s], colors, etc[.] that are affiliated with a criminal group."

(2) a reasonable belief that a person is in a criminal group and that person is identified as a member of a criminal group by two independent and reliable sources (Ex. Precinct, Personnel, Intelligence, School Safety, Juvenile Justice, Detective Bureau, Dept of Corrections, Outside Agency);

**Option B** (at least two of the following are required for entry):

(1) frequent presence at a known criminal group location;

(2) possession of criminal group-related documents;

(3) association with known criminal group members;

(4) social media posts with known criminal group members while possessing known criminal group paraphernalia;

(5) scars and tattoos associated with a particular criminal group;

(6) frequent wearing of the colors and frequent use of hand signs that are associated with particular criminal groups; or

(7) other.

63. Under these criteria, the NYPD enters people into the Database without any reasonable suspicion that they are engaging or have engaged in criminal activity. Similarly, the criteria do not require that a person included on the Database be convicted of any crime, much less any crime related to a criminal group, gang, or crew.

64. As with the term "criminal group," many of the terms included in the criteria for entry into the Database are undefined, vague, or misnomers, enabling the NYPD to arbitrarily enter people onto the Database in a racially discriminatory manner.

### 1. *The NYPD's "Self-Admission" Criterion*

65.    Option A(1) in the NYPD's criteria allows it to enter someone in the Database if they "self-admit" that they are a member of a "criminal group."

66.    This criterion is another misnomer.

67.    As Mayor Eric Adams explained, "I have yet to find someone who says, 'hey, Eric, I am in a gang.' So, let's be clear on that. Those who are in violent gangs do not go around saying 'yes, I do shootings and yes, I am in a gang.'"[6]

68.    When asked whether people willingly respond affirmatively when officers ask, "Are you in a gang?," then-Chief of Detectives Shea confirmed in a 2018 City Council hearing "that is not generally what happens." Nevertheless, as of 2023, "[t]he most common reason cited to support entry into the database was self-admission," according to the OIG Report.

69.    To find these "self-admissions" of gang membership, the NYPD focuses its attention on the social media of Black and Latino young men and then treats some of their social media posts as an admission of membership in a criminal group, even when the posts are not admissions of membership with *any* sort of group, let alone a criminal one.

70.    An NYPD gang detective testified that hand signs, clothing, or photos of people together that are posted online can constitute a person's self-admission.

71.    The Activation DD5 form explicitly provides that a "self-admission" may be based on social media posts, "such as language, symbols, picture[s], colors, etc[.] that are affiliated with a criminal group."

---

[6] NYC Mayor's Office, *Mayor Eric Adams Makes Affordable Housing-Related Announcement* at 45:25, YouTube (Nov. 14, 2022), https://www.youtube.com/watch?v=CdPWAeo4YQA.

72.     In this way, the self-admission criterion relies on the same factors as those described in Option B. But unlike Option B, there is no requirement that the NYPD identify two different factors before labeling someone as a "criminal group member." Instead, through the "self-admission" criterion, a single display of a color, hand sign, or picture "associating" with another person, for instance, can be grounds for entry into the Database.

73.     The Inspector General recognized the problem with the "self-admission" criterion, noting in the OIG Report that it allows the NYPD to add people to the Database "on the basis of more limited evidence of gang affiliation than Option B."

74.     With such a vague and broad "self-admission" criterion, NYPD personnel can and do rely on mundane social media posts to designate a person arbitrarily as having admitted to criminal group membership. On information and belief, the NYPD relied on personal social media accounts to enter the plurality of those added to the Database since 2017 and categorized these entries as self-admission to criminal group membership.

75.     The NYPD's vague criteria and lack of appropriate guidance cause its officers to enter people into the Database for anodyne, run-of-the-mill social media posts. For example, NYPD personnel have relied on photographs of children sitting on a staircase or standing on a basketball court, artwork honoring friends who have passed away, and posts using the commonly used word "gang" as self-admissions justifying entry into the Database.



Figure 1: A sample social media post used by the NYPD as the basis for adding a teenager to the Database.

76.    But, the term "gang" is ubiquitous in popular culture as harmless slang:



Figure 2: Social media post from Dana Carvey on X wishing the "gang" a great weekend.

77.    During her 2024 presidential campaign, then-Vice President Kamala Harris sought the support of the "Daddy Gang," the nickname for fans of the popular podcast *Call Her Daddy*, on which Harris appeared for an interview.[7]

78.    The world-famous musical artist Travis Scott popularized the term "gang gang" in a 2018 song by the same name. To date, the music video for "Gang Gang" has been viewed on YouTube more than 72 million times since 2019, and the song has been remixed and reimagined by multiple popular artists in the years since.[8]

79.    Through unfettered discretion, NYPD officers can and do make arbitrary and discriminatory judgment calls about when the use of "gang" on social media is no longer commonplace slang and is instead a self-admission of being part of a criminal group.

---

[7] Heather Schwedel, *What Was Kamala Harris Doing on Call Her Daddy*, SLATE (Oct. 7, 2024), https://slate.com/life/2024/10/kamala-harris-interview-call-her-daddy-podcast-alex-cooper.html
[8] *See* Travis Scott, Jackboys – Gang Gang, YOUTUBE (Dec. 27, 2019), https://www.youtube.com/watch?v=RIuk23XHYj0.

These instances, among others, prompted the Inspector General to express its concern that the "NYPD does not provide guidance to officers responsible for nominating and activating individuals as to the amount or nature of evidence required to establish that the criteria for activation are met."

### 2. *The NYPD's "Two Independent and Reliable Sources" Criterion*

83.     The NYPD's Option A(2) criterion is also vague. It permits NYPD personnel with "reasonable belief" that a person is a member of a criminal group, and "two independent and reliable sources" confirming that belief, to enter the person in the Database.

84.     As the OIG noted, "[t]he entry criteria do not define, and OIG-NYPD is not aware of any written policy that addresses the nature and quantity of evidence sufficient to establish a 'reasonable belief.'" Moreover, the 2021 IUP contains information about how officers are trained to identify a member of a criminal group or the criteria they are instructed to apply.

85.     Because the "two independent and reliable sources" are often both NYPD officers relying on the same vague, undefined terms of "reasonable belief" and "criminal group," many individuals, including Adam, Bryan, and Chris, have been arbitrarily labeled criminal group members under this criterion.

86.     Further, the Department has described this criterion in public testimony as requiring "not one but two independent law enforcement sources saying this person is in a gang. So, it's not only one investigator, but two [sic] law enforcement sources making that determination."

These instances, among others, prompted the Inspector General to express its concern that the "NYPD does not provide guidance to officers responsible for nominating and activating individuals as to the amount or nature of evidence required to establish that the criteria for activation are met."

### 2. *The NYPD's "Two Independent and Reliable Sources" Criterion*

83.    The NYPD's Option A(2) criterion is also vague. It permits NYPD personnel with "reasonable belief" that a person is a member of a criminal group, and "two independent and reliable sources" confirming that belief, to enter the person in the Database.

84.    As the OIG noted, "[t]he entry criteria do not define, and OIG-NYPD is not aware of any written policy that addresses the nature and quantity of evidence sufficient to establish a 'reasonable belief.'" Moreover, the 2021 IUP contains information about how officers are trained to identify a member of a criminal group or the criteria they are instructed to apply.

85.    Because the "two independent and reliable sources" are often both NYPD officers relying on the same vague, undefined terms of "reasonable belief" and "criminal group," many individuals, including Adam, Bryan, and Chris, have been arbitrarily labeled criminal group members under this criterion.

86.    Further, the Department has described this criterion in public testimony as requiring "not one but two independent law enforcement sources saying this person is in a gang. So, it's not only one investigator, but two [sic] law enforcement sources making that determination."

87.    However, the Department has also given contrary testimony, stating that *people outside of law enforcement* may serve as these sources. The Activation DD5 itself identifies non-law enforcement sources that can satisfy this criterion.

### 3. *The NYPD's "Option B" Criterion*

88.    Option B contains a medley of vague justifications for including someone in the Database, such as presence at "a known criminal group location," "association with known criminal group members," possessing "criminal group-related documents," wearing "colors . . . associated with particular criminal groups," and even "other."

89.    Neither the 2021 IUP nor the Activation DD5 defines key terms in Option B, including "known criminal group location," "criminal group-related documents," and "criminal group paraphernalia." Nor do these documents define which "colors" are "associated with particular . . . groups," although NYPD training materials indicate that they include black, gold, yellow, red, purple, green, blue, white, brown, khaki, gray, and orange. The NYPD does not publicize "known criminal group locations" or "criminal group members."

90.    Option B therefore endorses a criminal group member label under the following circumstances: if the person was seen talking to people outside their own public housing residence, when those people are in the Database and the NYPD deems that residence to be a "known criminal group location;" if the person frequented their local bodega while wearing their favorite blue Yankees cap, when the NYPD deems the bodega a "known criminal group location" and, as noted above, the NYPD considers the color "blue" to be a color "associated with [a] particular . . . group[]"; or if the person posted a picture on Facebook of themself in a sports jersey with their

cousin at a Super Bowl watch party, when the cousin is already in the Database. Each of these scenarios satisfies the two-factor threshold of Option B.

91.    The NYPD has long been on notice that Option B is over-inclusive. In 2018, when a City Councilmember asked whether wearing red clothing at a corner store that is a known gang location would result in himself being entered in the Database, then-Chief of Detectives Shea acknowledged: "It is possible."

92.    The OIG criticized several of the Option B criteria. Its report questioned the fairness of "known criminal group location" as a basis for entry in the Database, particularly when the location is someone's home.

93.    This concern is not unfounded. Under Option B, the NYPD has designated NYCHA properties in their entirety as gang locations and has added minors to the Database because "they frequented known gang locations, which were described . . . to be the NYCHA properties where they lived."

94.    The OIG Report further noted that "association with known criminal group members" lacks any objective definition. The report recounted how the whims of leadership, not the actual policy language, dictate how this criterion is applied: "NYPD stated that the way that the criterion is applied has shifted with changes in the leadership responsible for the [the Database], like the other criteria within the Option A and B activation pathways."

95.    The "Other" category of Option B serves as a catchall that offers NYPD personnel free rein to determine when someone should be added to the Database, presumably with any

justification. The Inspector General panned the use of "Other" because it "creates a risk that individuals will be included on an insufficient basis."

### C. The NYPD's 2023 Revisions to the Activation Criteria Did Not Resolve The Problems with the Criteria.

96.     In addition to its critiques of the activation criteria, the OIG criticized the evidence the NYPD relied on to add people to the Database, as well as the NYPD's documentation of that evidence.

97.     The OIG concluded that the NYPD's 2021 IUP "provides limited details about how individuals are added to the database; it does not explain the basis for the entry criteria or how individuals are evaluated against those criteria."

98.     Because the 2021 IUP and the corresponding Activation DD5 provide so little guidance to officers, NYPD officers routinely provide no supporting information about Option A or Option B at all, instead including only a boilerplate statement such as "On [DATE], the undersigned is requesting [Name of Subject] be entered in as a [CRIMINAL GROUP] member."

99.     The OIG concluded that, in more than two-thirds of the Activation DD5s that OIG reviewed for its report that cited association with "known criminal group members" as a basis for including someone on the Database, NYPD officers failed to provide details supporting their determination that someone was so associated.

100.     Based on the NYPD's pattern of providing conclusory justifications for entry into the Database, the OIG recommended that the NYPD audit the Database to identify erroneous entries and provide guidance to officers on how to apply activation criteria. The NYPD declined to do the recommended audit and, on information and belief, the NYPD has not provided officers,

to date, with additional guidance or revised training about its activation criteria. Nor has the NYPD resolved the problems identified by the OIG with the activation criteria themselves.

101.    In October 2023, the NYPD publicly issued a revised Impact and Use Policy (the "2023 IUP"). The 2023 IUP and the correspondingly updated Activation DD5 no longer include "Option B."

102.    In February 2025, the NYPD acknowledged that the OIG's critiques of Option B were "fair." By removing "Option B," the NYPD recognized that this criterion no longer served a defensible basis for labeling people as criminal group members. But, as noted above, *supra* ¶ 98, this apparent recognition of the OIG's criticism did not lead the NYPD to conduct the OIG-recommended audit of all the people on the Database to see if their entries are still proper, including people who were entered solely based on Option B.

103.    By December 2022, the NYPD had entered nearly two thousand people in the Database, based only on Option B. For those people who have not been removed from the Database despite their entry based only on Option B, the NYPD's elimination of Option B from the 2023 IUP is of no consequence because the NYPD continues to surveil and target them as criminal group members.

104.    The 2023 IUP, moreover, does nothing to address the self-admission portion of Option A, even though the OIG concluded that it permitted the NYPD to label and enter people into the Database with even *less* "evidence" of gang affiliation than Option B.

105.    In the 2023 IUP, Option A remains the same in substance. According to the 2023 IUP and its updated Activation DD5, the NYPD can enter people in the Database when they meet one of the following criteria under **Option A**:

> (1) a self-admission of criminal group membership to a member of the NYPD; or social media posts admitting to membership in a criminal group, "such as language, symbols, picture[s], colors, etc. that are affiliated with a criminal group"; or
>
> (2) a reasonable belief that a person is in a criminal group and that person is identified as a member of a criminal group by two independent and reliable sources (Ex. Precinct, Personnel, Intelligence, School Safety, Juvenile Justice, Detective Bureau, Dept of Corrections and Outside Agency).

106.    The updated Activation DD5 re-states all the vague terms in Option A found in the prior version of the Activation DD5, still without defining any of them. The DD5 continues to allow "language, symbols, picture[s], colors, etc[.]"—the same vague and imprecise factors previously named in "Option B"—to constitute a "self-admission" and basis for entry into the Database. Unlike Option B, which required two of the seven vague criteria to be satisfied, just one display of a color, use of a symbol, or other vague expression can still satisfy the "self-admission" criterion in Option A and alone justify entry into the Database.

107.    Moreover, the 2023 IUP still does not define "reasonable belief" or address the nature and quantity of evidence sufficient to establish membership in a criminal group. The 2023 IUP contains no information or guidance about how officers or other sources are trained to identify a member of a criminal group or the criteria they are instructed to apply in doing so. On information and belief, in establishing a "reasonable belief" under the 2023 IUP, officers rely on training that predates the 2023 revisions and that includes training on Option B, or they rely on no training at all.

108.    Through Option A, Option B's criteria effectively remain available as a basis for activation. Because "reasonable belief" remains undefined and unaccompanied by updated guidance, and because the self-admission criterion includes photographs in the company of other purported gang members, hand signs, clothing, colors, symbols, and the catchall "etc.," which replicates the criterion "other," Option B has been eliminated in name only.

109.    In its 2023 IUP, the NYPD also published new guidelines for determining whether someone should be removed from the "active" list of the Database and instead be tracked in the "inactive" list of criminal group members.

110.    Since issuing this new policy, the NYPD continues to label people, including Plaintiffs Adam and Chris, as "active" members on the Database, even though they meet the criteria for removal.[9]

111.    Overall, the 2023 IUP maintains many of the fundamental flaws in the prior IUP. Like the 2021 IUP, it does not define "criminal group," "gang," or "crew." Under the 2023 IUP, New Yorkers still are unable to conform their behavior to avoid the NYPD's criminal group labeling. The 2023 IUP continues to allow the NYPD to activate people into the Database in an arbitrary and discriminatory manner.

### III.    The NYPD Uses Its Vague Database Policies to Exclusively Target Black and Latino Groups and People.

112.    The NYPD has consistently labeled Black and Latino city residents as criminal group members in the Database at starkly disparate rates when compared to white residents.

---

[9] And, as is discussed *infra* at Section VIII.B, Plaintiff Bryan continues to experience harms from his initial labeling and entry into the Database even after the NYPD removed him from the "active" list and shifted him to the "inactive" list.

113.    The extreme racial disparities in the composition of the Database persist to date. In February 2025, the NYPD testified that "99% of the individuals in the database are people of color."

114.    Compared to their percentage of New York City's population, Black and Latino New Yorkers are significantly overrepresented in the Database.

115.    According to NYPD records, nearly 99% of the 17,452 people whom the NYPD added to the "active" list of the Database between January 2014 and February 2018 were Black or Hispanic.[10] Only 0.8% of the people added to the "active" list of the Database were white. During roughly that same four-year period, Black and Hispanic people made up 51% of New York City residents, according to the U.S. Census Bureau.[11] Non-Hispanic white people made up 32.1% of New York City's population in roughly this same period.[12]

---

[10] The NYPD disaggregates its data by race using the terms "Black," "Black Hispanic," "White Hispanic," "White," "Asian/Pacific Islander," "American Indian," and "Other." When the allegations are based on the NYPD's data, the Complaint uses these terms or combines "Black Hispanic" and "White Hispanic" into a single "Hispanic" category.

[11] This estimate is based on the American Community Survey 2018 5-year estimates, which reflects 60 months of data collected between January 1, 2014 and December 31, 2018. U.S. Census Bureau, 2018 5-Year Am. Cmty. Surv., *B03002 Hispanic or Latino Origin By Race*, https://data.census.gov/table/ACSDT5Y2018.B03002?q=american%20community%20survey%20race%20ethnicity &g=160XX00US3651000. The percentage was calculated by summing the percentage of non-Hispanic Black residents and the percentage of Hispanic residents of any race.

[12] This estimate is based on the American Community Survey 2018 5-year estimates, which reflects 60 months of data collected between January 1, 2014 and December 31, 2018. *See, supra*, note 11.

116.    In its report, the OIG found that, as of December 2022, there were 16,141 "active" people listed in the Database, and 99% were Black and Hispanic people. Yet, at that time, Black and Hispanic people made up only 49.4% of New York City residents.[13]

117.    In 2025, these racial disparities persisted. As of February 2025, the NYPD tracked 13,212 people as "active" in the Database. At that time, Black and Hispanic people accounted for 98.58% of the "active" Database. Yet, at that time, New York City was only 48.73% Black and Hispanic.[14]

118.    The racial disparities persist in the list of people labeled as "inactive" members of criminal groups in the Database. In 2025, the NYPD tracked 14,116 people as "inactive." At that time, Black and Hispanic people accounted for 96.84% of the "inactive" Database.

119.    Furthermore, as of 2025, the racial and sex composition of the active list of the Database was 69.35% non-Hispanic Black men and boys and 27.45% Hispanic men and boys. For the "inactive" list, 60.32% of the people tracked were non-Hispanic Black men and boys and 32.71% Hispanic men and boys. In contrast, according to the 2020 Census data, non-Hispanic Black men and boys were only 9.16% of New York City residents and Hispanic men and boys were only 13.47% of New York City residents.[15]

---

[13] This estimate is based on the American Community Survey 2022 1-year estimates, collected from January 1, 2022 to December 31, 2022, and was calculated by adding the number of non-Hispanic Black residents and the number of Hispanic residents of any race. U.S. Census Bureau, 2018 1- Year Am. Cmty. Surv., *B03002 Hispanic or Latino Origin By Race,*
https://data.census.gov/table/ACSDT1Y2022.B03002?q=american%20community%20survey%20race%20ethnicity&g=160XX00US3651000.

[14] This estimate is based on the American Community Survey 2023 1-year estimates, collected from January 1, 2023 to December 31, 2023. U.S. Census Bureau, 2018 1- Year Am. Cmty. Surv.,
https://data.census.gov/table/ACSDT1Y2018.B03002?q=american+community+survey+race+ethnicity&g=160XX00US3651000

[15] This estimate is based on the 2020 decennial Census.

120.    The NYPD has long been aware of these racial disparities and the availability of less discriminatory alternatives to the Database.

121.    In his 2018 testimony during a hearing before the City Council Committee on Public Safety, then-Chief of Detectives Shea acknowledged that 99% of people whom the NYPD labeled and tracked in the "active" Database at that time were Black and Hispanic.

122.    During the public testimony portion of the 2018 hearing, Professor Babe Howell testified about various alternatives the NYPD could employ to address the NYPD's stated objectives for the Database while mitigating the discriminatory impact of the Database on Black and Latino communities.

123.    Members of the public also testified about the racially disparate makeup and impact of the Database and the harm and negative effects the NYPD's enforcement of the Database causes to Black and Latino communities.

124.    The following year at a hearing before the Committee on Public Safety, former Assistant Chief James Essig confirmed to the City Council that the Database's racial disparity persisted. When Chairperson Richards asked Essig to confirm that there were only "1.1% white people in gangs in New York City," Essig responded with sarcasm: "The NYPD does not control the recruitments for criminal groups. Now, if the council member wants to hold a hearing about diversity in recruitment efforts, you know, in these groups, we'll be in the audience taking notes[.]"

125.    In 2018 testimony before City Council, Department officials acknowledged that the NYPD "does not enter every person that fits the criteria" for entry in the Database. Thus, the

overrepresentation of Black and Latino youth in the Database is not by chance, but instead a product of NYPD's discretion.

126.    In response to a question from then-Chairperson Richards about the likelihood they might be included in the Database if they satisfied two criteria, then-Chief of Detectives Shea confirmed the NYPD's selectivity and responded: "I suspect that you wouldn't be entered at all, and the reason for that is because those are two criteria that we look for, that we can—we 'can' is the key word."

127.    The NYPD targets Black and Latino people as purported members of "criminal groups" for inclusion in the Database, while excluding white people and predominantly white groups who satisfy the same criteria and/or engage in the same social media behavior that the NYPD deems "self-admission" for Black and Latino people.

128.    Indeed, the NYPD does not even apply the label "criminal group" or the criteria of the Database to white "group" entities that the NYPD explicitly describes as criminal in nature.

129.    In 2018, then-Chief of Detectives Shea testified before City Council that, as a policy and practice, the Database does not include members of predominantly white organized criminal groups, like the Russian and Albanian criminal organizations.

130.    In the 2019 City Council hearing, when asked for an explanation of why the Department has a policy of distinguishing between "traditional organized groups" and "gangs," then-Executive Director of Legislative Affairs for the NYPD, Oleg Chernyavsky said: "Well, we don't—I just answered that the tracking mechanism is different because the nature of the investigations are different. One is local and one is done collaboratively with the federal

government because the crimes of traditional organized crimes are of such a nature that they cross boundaries, and when you cross boundaries you need to pull in the law enforcement entities that are on the other side of that boundary."

131.    However, in an August 8, 2024 interview, NYPD Deputy Chief Jason Savino stated that "the gang database is crucial" to its policing of "Venezuelan, Ecuadorian, and Columbian gangs" and stated that the NYPD "treat[s] all gang members the same whether they are homegrown or migrants."[16]

132.    The NYPD has also explicitly used race to distinguish "gangs" from other groups suspected of criminal activity in written documents. For example, the NYPD's Patrol Guide has directed officers to take different steps in response to intelligence about "Asian or Russian organized crime" as compared to "information concerning criminal gangs, gang/motivated incidents." The Patrol Guide does not direct officers to log intelligence about "Asian or Russian organized crime" for entry into the Database.

133.    Pursuant to policy and practice, the NYPD expressly defines the parameters of the Database to exclude groups of white and Asian people who may commit, or the NYPD suspects to have committed, crimes in New York City and, as a result, exclusively targets Black and Latino people for entry.

---

[16] Mona Davids, *Exclusive Interview with NYPD Assistant Chief Jason Savino*, NEW YORK VOICE (Aug. 9, 2024) https://www.newyorkvoicenews.com/exclusive-interview-with-nypd-assistant-chief-jason-savino.

134.    During the 2019 hearing before City Council, when then-Chairperson Richards asked "were white supremacists to wreak havoc . . . on our street, would they be put in [the D]atabase," an NYPD official responded "sure."

135.    However, the Proud Boys is not, and on information and belief, has never been, included in the Database. The Proud Boys, a far-right, neo-fascist, and white nationalist organization, has a formal leadership structure and uses several motifs, tattoos, and colors (black and yellow) to indicate group membership.[17] The group has a history of violence, and multiple members have been convicted of violent group-based felony crimes, including attempted gang assault, that they committed in New York City. [18]

136.    The white supremacist group "Maniac Murder Cult" conspired with another neo-Nazi group in 2022 to solicit new recruits to commit hate crimes and mass murder in New York City as part of the application process for entry into the two groups. The leader of the "Maniac Murder Cult" encouraged members and new recruits to target racial minorities and "murder for the white race," like he had previously done.[19] In 2023, the U.S. Department of Justice spoiled his scheme to help a recruit build a bomb to kill racial minorities and develop poison so the recruit could dress up as Santa Claus and hand out poison-laced candy to children at Jewish schools in

---

[17] Jade Bremner, *What does the Proud Boys rooster symbol mean and what are the group's other secret symbols?*, THE INDEPENDENT (Sept. 7, 2021), https://www.independent.co.uk/news/world/americas/proud-boys-symbolism-altright-b1915741.html.
[18] Ali Watkins, *With Rise of Far-Right Extremists, N.Y.P.D. Creates Special Unit*, NY TIMES (Dec. 11, 2019), https://www.nytimes.com/2019/12/11/nyregion/nypd-reme-unit-supremacist-nazis.html?searchResultPosition=1.
[19] Katie Houlis, *Alleged "Maniac Murder Cult" Leader Accused of Planning to Poison Children in NYC*, CBSNEWS (July 16, 2024), https://www.cbsnews.com/newyork/news/maniac-murder-cult-plot-to-poison-children-nyc/.

Brooklyn. Despite this, the "Maniac Murder Cult" is not, and on information and belief, has never been, included in the Database.

137.    Another white supremacist group, "Patriot Front," whose members have been arrested for plotting a riot at an LGBTQ Pride event, has been recently active in recruiting members and increasing its influence in New York.[20] Members of the group have been known to use spray paint to tag public property in New York City with symbols associated with the group. In 2021, the New York City members of Patriot Front vandalized a George Floyd statue in Brooklyn.[21] Despite the group's growing presence in New York City, and its past criminal behavior the "Patriot Front" is not, and on information and belief, has never been in the Database.

138.    The NYPD labels and targets several ostensible groups in the Database with explicit references to the purported race, ethnicity, and/or national origin of the groups' members and associates, but it does not make similar references for groups that are comprised of white members. For instance, the Database includes "Black Mob Set," "Only the Africans," "Dominicans Don't Play," "Cholos/Mexican Gang," "18th Street Mexican Gang," "Jamaica Maya Set," "Haitian Mafia," and "The Mexican Boys."

139.    On information and belief, none of the many "criminal groups" in the Database, which are identified based on ethnicity or national origin, reference a country or ethnicity with a primarily white demographic population.

---

[20] Odette Yousef, *31 members of the white nationalist Patriot Front arrested near an Idaho Pride event,* WLIW (June 11, 2022), https://www.wliw.org/radio/news/31-patriot-front-members-were-arrested-near-an-idaho-pride-event/.
[21] Ali Watkins, *George Floyd Statue in Brooklyn Is Defaced With Hate Group's Symbol,* NY TIMES (June 24, 2021), https://www.nytimes.com/2021/06/24/nyregion/george-floyd-statue-vandalized-brooklyn.html.

**IV.    NYPD Training and Guidance on Identifying People for the Database Promote Discriminatory Enforcement.**

140.    The NYPD's training and guidance on how to apply the Database criteria exacerbate and further drive the targeting of Black and Latino individuals for entry into the Database, resulting in extreme racial disparities, and encourage officers to, as a widespread practice, interpret and implement the NYPD's vague criteria based, at least in part, on a person's race, ethnicity, and/or national origin.

141.    Though the NYPD has relied on its vague criteria to label Black and Latino people as "criminal group" members based on their family relationships, friendships, school associations, and local neighborhood residences, the NYPD has not done and does not do the same for white people.

142.    NYPD training documents instruct officers to target events honoring specific ethnic groups and to treat certain cultural expression as evidence of affiliation with a criminal group. For example, training slides in a PowerPoint regarding the Database criteria and its application include participation in the "Puerto Rican Day Parade" or a person's display of "Mexican Tattoos" as a sign of affiliation with a criminal group, as depicted below in Figure 5.



Common phrases, show awareness of their gangster life and how it is
unaccepted by family and others. often written in Old English Font

Figure 5: A slide from the NYPD's Database Training

143.    A training PowerPoint slide, *see* Figure 6, identifies religious imagery and symbols

with particular ethnic and/or cultural significance as indicative of gang membership, and the slide's

notes include what is understood to be a derogatory term used to refer to someone of Mexican

descent.

> Tattoos are highly symbolic in nature. Commonly you will see pictures of
> praying hands which signify praying to god for forgiveness. Our lady of
> Guadalupe is the favorite patron saint of Mexicans and a common iconic
> tattoo. Another common tattoo is the "cholo" symbol which signifies the
> struggle for acceptance in America during the 1940's

Figure 6: Speaker notes accompanying a slide from the NYPD's Database Training

144.    That same training PowerPoint *exclusively* depicts Black and Latino professional athletes in photos or videos and questions whether they are gang members. For example, a slide, *see* Figure 7, questions whether NBA player Paul Pierce, who is in the Basketball Hall of Fame, and NBA player Kendrick Perkins are members of the Bloods because they signaled the number "three" with their hands—a common celebration in the NBA when a player or their teammate makes a three pointer.



Are these blood signs or are they just representing Boston?? Kids do emulate what they see.... Paul Pierce and Kendrick Perkins

Figure 7: A slide from an NYPD Database Training Picturing Paul Pierce and Kendrick Perkins.

145.    Another NYPD training slide, *see* Figure 8, questions whether Serena Williams, widely regarded as the greatest female tennis player of all time, is a gang member based on a video of her doing the popular "C-walk" dance to celebrate her winning the gold medal at the 2012 Summer Olympics.



Figure 8: A slide from an NYPD's Database Training which includes a photo of Serena Williams.

146.    Against this backdrop of highlighting only Black celebrities and aspects of Black and Latino culture as relevant to identifying criminal group members, the NYPD also trains officers to view popular apparel and designer items as indicia of gang involvement.

147.    According to the NYPD, wearing a belt by "Ferragamo, Hermes, Louis Vuitton, [and] Gucci" or in the "[r]ange [of] $350-700" may be a sign that someone is in a criminal group. Additional items the NYPD claims are associated with gangs or crews include Marmot jackets, Canada Goose jackets, Nike Air sneakers, and designer shoes. It even includes brands Nike, Adidas, Dickies, DC, and Monster and apparel for sports teams like the Los Angeles Dodgers and the New York Yankees.

148.    New Yorkers of all races wear these designers, brands, and logos, but *every example* of worn apparel in the training's presentation has a Black or Latino person. One slide

suggests that Canada Goose coats signify gang membership by showing the Black rapper Drake in a Canada Goose coat standing next to the white television personality Carson Daly in a peacoat. This sends a clear message to officers that wearing Canada Goose, Ferragamo, or Adidas is a sign that you are in a gang, as long as you are Black or Latino.

149.   The trainings also instruct officers to target their efforts toward NYCHA developments and assert that a "new generation of gang member" is "geographically based" and tends to live in these housing developments, as opposed to private homes.

150.   As of January 2025, of the total population of families living in NYCHA public housing developments, 4.50% are white, 43.26% are Black, 44.67% are Hispanic, 6.12% are Asian, and 1.45% are "Other."[22]

151.   In 2017, over 90.0% of public housing residents were Black or Hispanic—54.9% of residents living in NYCHA housing were Hispanic, 36.6% percent were Black, 3.1% were white, and 3.1% were Asian.[23]

152.   The NYPD trains officers to consider a person's mere presence in NYCHA housing—including the housing complex they call home—as indicative of criminal group membership.

153.   The NYPD has even labeled some purported groups by simply referring to the name for an entire NYCHA building, or housing complex. For example, the NYPD lists the following purported groups as "criminal groups" in the Database: "Neptune Ave from West 33rd to Bayview

---

[22] N.Y.C. Hous. Auth., Resident Data Book 1 (Jan. 2025),
https://www.nyc.gov/assets/nycha/downloads/pdf/Resident-Data-Book-Summary.pdf
[23] N.Y.U. Furman Ctr., *How NYCHA Preserves Diversity in New York's Changing Neighborhoods* 3 (Apr. 2019),
https://furmancenter.org/files/NYCHA_Diversity_Brief_Final-04-30-2019.pdf.

Ave.," "3661 and 3663 Nostrand Ave.," "(34 Pct.) Dykman Houses," "Mariner's Harbor housing complex," "BRONX RIVER HOUSES (43 PCT)," "UNITY HOUSES BLAKE SIDE," and "UNITY HOUSES SUTTER SIDE."

154.    The NYPD's labeling of even just a single NYCHA housing complex as a criminal group can impact thousands of New Yorkers. For example, NYCHA's Edenwald Houses in the Bronx includes forty buildings and is home to approximately 5,000 residents. Likewise, the NYPD's labeling of a single NYCHA housing complex as a "known criminal group location," can similarly impact large groups of people. NYCHA's Mariner's Harbor complex, which includes twenty-two buildings spread out over approximately two square city blocks, is home to more than 1,300 residents.

## V.    The NYPD Criminalizes Youth Behavior in a Manner that Reverberates Through Adulthood.

155.    The training described above criminalizes the behavior of Black and Latino kids in disparate and harmful ways.

156.    The groups of people or "crews" that the NYPD claims are "criminal groups" are described by many people on the Database as an entirely innocent and universal phenomenon: groups of young people spending time with friends and relatives who live in their community and celebrating the housing complex that they call home.

157.    Behaviors such as "sitting together at school, hanging out after class, dressing alike and giving themselves nicknames and symbols" are often related to a natural desire to belong to a

friend group or "clique," which is "a normal part of adolescent development" and "encouraged for healthy social engagement."[24]

158.    These social groups are organically built on family and close interpersonal relationships and often describe their purpose as one of friendship, family, music, sport, and community service.

159.    These relationships have substantial benefits. For example, studies show that graduation rates increase when schools welcome fraternities and sororities—other examples of social groups that share a group name, symbols, and colors—onto campus.

160.    The NYPD allows similarly situated white children in New York City to enjoy these interpersonal relationships without scrutiny, while adding Black and Latino youth to the Database and labeling them members of a criminal group for engaging in similar behavior as their white counterparts.

161.    By listing them in the Database based on those same types of associational ties, Black and Latino youth effectively are punished based on race.

**VI.    The NYPD is Using the Database to Continue Its Stop and Frisk Practice Under a New Name.**

162.    The NYPD developed the Database to achieve the same ends of Stop and Frisk after the legislature and courts declared that practice and related information collection practices to be unlawful in a series of actions between approximately 2012 and 2014.

---

[24] Kristin Henning, The Rage of Innocence: How America Criminalizes Black Youth, 1, 72–73 (Pantheon 2021).

163.    From 2003 to 2006, more than 85% of the people the NYPD stopped under its Stop and Frisk practice were Black and Latino. For more than 90% of the people stopped, the NYPD found no evidence that they engaged in any criminal activity.

164.    According to testimony by then-State Senator Eric Adams in federal court, former-NYPD Commissioner Raymond Kelly told Adams and other New York state government officials that the NYPD "targeted" its stop-and-frisk activity toward young Black and Latino boys and men "to instill fear in them" that "every time they leave their home, they could be stopped by the police."[25]

165.    Beginning in 2006, the NYPD created an electronic database for Stop and Frisk, which catalogued the information that the NYPD recorded during each stop. That database included the personal identifying information of the hundreds of thousands of New Yorkers, mostly Black and Latino, who were stopped and frisked despite not engaging in any criminal activity.

166.    From 2010 to 2013, legislation, federal class action lawsuits, and New York state lawsuits restricted both the NYPD's Stop and Frisk policy and practices and the database used to house information related to those stopped.[26]

---

[25] Transcript of Trial Testimony of Eric Adams, 1588:1 – 1589:19 (Apr. 1, 2013), *Floyd v. City of New York*, No. 08-CV-1034, ECF No. 335.
[26] *Floyd v. City of New York*, No. 08-cv-01034 (S.D.N.Y.), filed in 2008, challenged the NYPD's department-wide SQF policies and practices as racially discriminatory and violative of the Fourth Amendment. In 2010, *Davis v. City of New York*, No. 10-cv-00699 (S.D.N.Y.), challenged the NYPD's stop-and-frisk and trespass arrest practices in and around NYCHA housing, as racially discriminatory and violative of the Fourth Amendment and Fair Housing Act. In 2012, *Ligon v. City of New York*, No. 12-cv-02274 (S.D.N.Y.), challenged the NYPD's stop-and-frisk and trespass

167.    In 2010, a new state law prohibited the NYPD from using a database to continue to track the names and other personal identifying information of people who were subjected to Stop and Frisk but were not arrested or issued a summons. Upon signing the law, then-Governor David Paterson stated, "The practice of holding on to the names and addresses is an unfair and unsupportable infringement on the civil rights of law abiding New Yorkers."[27]

168.    In October 2012, a federal court certified, as class actions, two separate federal civil rights lawsuits challenging Stop and Frisk, enabling the plaintiff classes to obtain department-wide injunctive relief. That same month, however, the NYPD announced Operation Crew Cut, the NYPD's new program targeting so-called "crews" with police resources.

169.    The next year, that federal court found, after a lengthy trial, that the NYPD had engaged in widespread, unconstitutional racial profiling that intentionally targeted Black and Latino New Yorkers. As a result, the court ordered sweeping reforms, including an Independent Monitor for the NYPD. The NYPD promptly pivoted from its Stop-and-Frisk policy to using the newly-centralized Criminal Group Database in conjunction with expanded gang policing resources to target the same demographics that had been disparately stopped and frisked.

170.    Following the federal court's order that the NYPD cease its unconstitutional and racially-biased Stop and Frisk policy and practices, the stops officially recorded by NYPD officers

---

arrest policies and practices in and around private "Clean Halls" apartment buildings as racially discriminatory and violative of the Fourth Amendment and Fair Housing Act. In 2012, the New York State Appellate Division, First Department ruled in favor of two plaintiffs who sued to challenge the SQF Database. In 2013, New York City settled this lawsuit and agreed to erase, from the SQF Database, the names and addresses of all people who have been stopped, arrested, or issued a summons and whose cases were either dismissed or resolved with a fine for a noncriminal violation.

[27] Michael Clancy, *Paterson Signs Law Restricting Stop-and-Frisk Database*, NBC NEW YORK (Jul. 16, 2010) https://www.nbcnewyork.com/news/local/bloomberg-cops-outraged-as-gov-prepares-to-delete-frisk-list/1876055/.

between 2014 and 2018 decreased by 74.6%. During that same period, from January 2014 to February 2018, the number of people whom the NYPD entered into the "active" Database and labeled as "active" "crew" or "gang" members increased by 70%.

171.    The racial disparities of people targeted for entry into the Database are more extreme than other racially discriminatory policing practices that have been struck down as unconstitutional under the Fourteenth Amendment. In 2012, the year before the NYPD's Stop and Frisk policy and practices were ruled unconstitutional, 87% of the stops recorded in New York City were of Black and Latino people: 55% were Black, 32% Latino, and 10% white. In 2011, 87% of the people stopped pursuant to the unconstitutional practice were Black and Latino: 53% were Black, 34% Latino, and 9% were white. By contrast, as of February 2025, 98.58% of the "active" Database is Black and Hispanic. White people constitute 0.58% of the "active" Database.

172.    The NYPD remains under federal court supervision based on its widespread constitutional violations through its Stop and Frisk program. After more than a decade of supervision, the NYPD has still failed to substantially comply with court orders, including the order to remedy its practices of intentional discrimination.

**VII.    *Database Enforcement: Surveillance, Unequal Policing of Low-Level Infractions, and Prolonged Detentions and Interrogations.***

173.    By policy and practice, the NYPD polices people on the Database more heavily and subjects them to more police intrusions.

174.    The Department targets and singles out Black and Latino men and boys for digital surveillance, closely monitoring their social media activity and aggregating the results of that surveillance in digital dossiers intended to inform further surveillance. The Department conducts

this surveillance both for the purpose of entering new people into the Database and to justify keeping people in it.

175.    After entering them into the Database, the NYPD targets those same people for unequal street surveillance and enforcement of low-level infractions. The Department uses the Database to inform enforcement actions through programs such as Operations Ceasefire and Crew Cut. As part of these operations, the NYPD developed a strategy of identifying alleged members of criminal groups and targeting them for unrelenting stops and arrests for even the most minor offenses—such as jaywalking (until it was decriminalized this year) and biking on the sidewalk.

176.    When the NYPD stops or arrests people who are in the Database, pursuant to policy and practice, officers detain them for an unreasonable time for the sole purpose of interrogation about local events and people unrelated to the reason given for the stop or arrest and, at times, unconnected to the investigation of any crime.

177.    Official NYPD policy authorizes officers to share information about the people in its Database with prosecutors, city agencies, and "community leaders, civic organizations and the news media," among others, causing the gang or crew label—and the stigma that comes with it—to follow people far beyond their interactions with the NYPD.

178.    Information sharing with prosecutors, in particular, creates cascading harms for those on the Database. On information and belief, District Attorneys' offices treat defendants who are in the Database more harshly than those who are not.

179.    Altogether, the NYPD's Database enforcement policies and practices stigmatize Black and Latino men and boys and encourage their surveillance and harassment based on racial profiling.

### A. Social Media Surveillance

180.    The NYPD has entered thousands of people into the Database due to their social media activity. However, the NYPD does not subject every New Yorker to this digital surveillance. For example, in his public testimony, then-Chief Shea admitted that the NYPD is "not scouring the internet looking for kids flashing signs." Rather, it is monitoring the social media activity of only a select group.

181.    Specifically, officers monitor social media both to identify potential group members to enter into the Database—using unreliable and racially-biased criteria, as alleged above—and to learn information about people already on the Database, which informs the harassment and interrogations that these people experience in the street and in and around their homes.

182.    As then-Commissioner Raymond Kelly explained, social media surveillance is a core feature of Operation Crew Cut, and the NYPD directs officers to closely monitor the social media activity of so-called "crews" pursuant to Operation Crew Cut's parameters.

183.    To date, the Real Time Crime Center's Social Media Analysis and Research Team plays a key role in determining who is entered into the Database, including through their review of recommendations for people to be added.

184.    This unequal surveillance is, in effect, Stop and Frisk gone digital. The NYPD is doing online today what it once did on the streets: gathering information about and searching teenagers and young men of color at disparate rates based on racially biased assumptions of criminality.

185.    The NYPD's increased reliance on automated tools to monitor social media further amplifies the reach of this surveillance. The NYPD aggregates the data collected through unequal social media surveillance to create digital dossiers for the purpose of surveilling and targeting Black and Latino people. When an officer enters a person into the Database based on social media, NYPD technology can preserve that person's entire social media page. Social network analysis tools further allow the NYPD to retain information on social networking platforms—even after it has been deleted by users or if an account has been deactivated.

186.    The NYPD performs this surveillance in several ways, including by creating fake profiles on different social networks and using those profiles to follow and monitor the social media profiles of Black and Latino young people and children.

187.    Officers even resort to "catfishing"—*i.e.*, impersonating others to send friend requests to their targets to circumvent their privacy settings that restrict a person's page from public viewing. For example, teenagers have received friend requests from accounts of individuals known to be incarcerated and without access to social media.

188.    The NYPD further uses social network analysis tools to automate the inspection of social networks, including by reviewing, retaining, and processing audio, video images, and location information contained on social networking platforms. Officers create alerts to be notified

of new activity on selected social media accounts. At times, downloaded images are used for facial recognition analyses.

189.    According to February 2025 testimony from the Deputy Commissioner of Legal Matters, the NYPD does not have any specific safeguards governing their use of social media surveillance as it relates to the Database. The Department does not seek court authorization prior to using social network analysis tools.

190.    The harm of these digital stop and frisk practices are serious and long-lasting. The NYPD subjects children as young as 12 to intense social media surveillance for the purpose of identifying individuals to potentially enter into the Database. For example, a former gang detective testified to monitoring the social media activity of a 12-year-old girl because her siblings had been targeted as "gang members" and she was present at "incidents of violence."

191.    Young people on the Database report being highly aware that the NYPD is monitoring their social media activity and the activity of their friends. As a result, on information and belief, many change their behavior on social media by posting less frequently or by changing the song lyrics or scenes they write about to avoid further scrutiny and to prevent law enforcement from using their social media to justify allegations of wrongdoing, including designation as a gang member.

### B. *Street Surveillance*

192.    NYPD surveillance practices extend beyond social media and into communities, placing people on the Database under constant police scrutiny, particularly in and around the neighborhoods where they grew up and still call home.

193.    As part of Operation Ceasefire, the NYPD has sent letters to people on the Database, threatening heightened surveillance due to their purported criminal group membership.

194.    As the NYPD testified in February 2025, it uses the Database to make decisions about where to deploy officers. Field Intelligence Officers ("FIOs")—who are empowered to recommend a person for entry into, renewal on, or reactivation in the Database—are assigned to the NYCHA developments that have been designated as a focus of gang policing, consequently subjecting those residing in and around those NYCHA properties to greater scrutiny and increased likelihood of being entered into the Database.

195.    Officers follow people on the Database as they walk down city blocks, including those walking home from school. As young people gather in courtyards, parks, or other public spaces, officers will circle the block in their vehicles. At times, those on the Database witness officers taking their photographs or recording them from their vehicles.

196.    On information and belief, in addition to street surveillance, officers view video surveillance footage to monitor the movement and interactions of those labeled as "gang" members, as well as their loved ones.

197.    As a result of this oppressive surveillance, people on the Database have become fearful of police and feel like they always have to watch over their shoulders. They avoid certain blocks, parks, subway stations, or other places where police are known to be stationed, and spend less time outside during the summer, when the police surveillance is heightened. Teenagers are afraid to walk home alone for fear of police harassment. Mothers share these fears, wondering if

their own children will be added to the Database simply because of where they grew up, and consequently, therefore, become subjected to a life of hyper surveillance and hyper policing.

198.    These feelings of anxiety are most heightened in and around their own neighborhoods and where they grew up. Officers frequently harass, surveil, and photograph people who are on the Database in NYCHA courtyards and parks, and stop and interrogate them in building hallways.

199.    At times, officers call out to people on the Database by name or social media handle in the street, indicating an alarming degree of familiarity. Officers have made threatening statements to people on the Database, warning them that they are being watched (e.g., stating "we know who you are" or "we are coming for you").

200.    Although NYPD training materials make clear that "gangs" can be found in every neighborhood, a map analysis of the neighborhoods and specific blocks targeted for gang policing efforts found significant overlap with those communities most affected by Stop and Frisk.[28]

201.    In 2013, when holding the Department liable for racial profiling, a federal court found that the racial makeup of an area predicted the number of people the NYPD stopped in that area more accurately than the crime rate.[29]

202.    Following years of these surveillance practices, the parallel between "gang" surveillance and Stop and Frisk practices became apparent to those in City government. As then-Council Member Donovan Richards explained to the NYPD then-Chief of Detectives Dermot Shea

---

[28] George Joseph, *Has 'Gang Policing' Replaced Stop-and-Frisk?*, BLOOMBERG (Feb. 28, 2017), www.bloomberg.com/news/articles/2017-02-28/the-nypd-s-gang-policing-looks-a-lot-like-stop-and-frisk .

[29] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 560 (S.D.N.Y. 2013) ("NYPD carrie[d] out more stops where there are more black and Hispanic residents, even when other relevant variables are held constant.")

in 2018, "It seems to be the same communities, whether it's stop and frisk, whether it's surveillance, being overpoliced."

203.    Because of persistent surveillance and harassment in and around their own homes, many people avoid the public areas in their apartment complexes, such as courtyards, parks, and basketball courts, causing them to lose access not only to these spaces but to their communities. In this way, NYPD gang policing tactics interrupt community-building and disrupt social ties.[30]

204.    The NYPD's digital and street surveillance practices have likewise caused New Yorkers to avoid association with classmates, friends, neighbors, and even family members. People who have friends and family on the Database face an impossible choice: risk being entered into the Database for associating with alleged group members or distance themselves from their closest friends and relatives.

205.    Some people on the Database have also distanced themselves from friends and loved ones to protect them from increased surveillance and possible entry into the Database.

---

[30] People subjected to increased policing also report reluctance to call the police when safety risks arise or to cooperate in investigations after the fact. Moreover, for Black children, research shows that "distrust of police officers transfers over to other state actors [and] sometimes translates to teachers, probation officers, other adult authority figures," further disrupting community ties. The NYPD's reliance on reports from outside actors—such as school staff—to justify a person's inclusion on the Database heightens these feelings of distrust. Kristen Henning & Joe Donahue, *America Criminalizes Black Youth*, WAMC (Nov How. 1, 2021), https://www.wamc.org/podcast/the-roundtable/2021-11-01/how-america-criminalizes-black-youth. *See, also,* Tom. R. Tyler, et. al, *Street Stops and Police Legitimacy: Teachable Moments in Young Urban Men's Legal Socialization*, 11 J.EMPIRICAL LEGAL STUD. 751, 775 (2014) (concluding that greater police legitimacy predicts lower levels of criminal behavior and increased cooperation with police); Tom R. Tyler, *Policing in Black and White: Ethnic Group Differences in Trust and Confidence in the Police*, 8 POLICE QUARTERLY 322, 322 (2005) (reporting that citizens do not use the criminal justice system when they do not trust it); Tom R. Tyler & Jeffrey *Fagan, Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 OHIO ST. J. CRIM. L. 231, 234, 263 (2008) (showing that people are more willing to cooperate with the police, report crime in their neighborhoods, and work with neighborhood groups when the police are seen as legitimate); Jeffrey A. Fagan and Garth Davies, *Policing Guns: Order, Maintenance and Crime Control in New York in Guns, Crime, and Punishment in America* 191, 209 (Bernard E. Harcourt, ed., 2003) (describing how unfair policing practices may lead to crime).

### C. *Unequal Enforcement of Low-Level Infractions*

206.    As part of the Department's street surveillance related to the Database, the NYPD instructs, encourages, and trains officers to target people listed in the Database for pretextual stops and disparate enforcement of low-level infractions, such as littering, jaywalking, or spitting.

207.    The NYPD stops people listed in the Database most persistently in and around NYCHA apartment complexes, where they currently or previously have lived and which have been labeled by the Department as "known criminal group locations."

208.    The NYPD targets people on the Database for repeated pretextual stops and police encounters in their neighborhoods, at times without any stated justification, reasonable suspicion, or probable cause to believe that the stopped person committed an offense.

209.    Frequently, despite the involvement of more experienced and supervisory personnel, such as detectives, these stops often result in no arrest, ticket, or explanation.

210.    In early 2025, the Independent Monitor for the NYPD found that officers in Neighborhood Safety Teams ("NST")—units specifically tasked with targeting "gang" members—engage in higher rates of unconstitutional stops and frisks than regular patrol units. Of the stops conducted by NST officers in 2023, 25% were unlawful. Nearly half of the frisks (42%) and searches (46%) conducted by NST officers were unlawful. Based on a sample of stops by NST officers, 95% of those stops were of Black or Hispanic New Yorkers and 97% were of male.[31]

---

[31] "Neighborhood Safety Teams" were established by Mayor Adams in June of 2023 to replace the "anti-crime unit," a plain clothes unit which was disbanded in 2020. The "anti-crime unit" was a reincarnation of the notorious Street

211.    By policy and practice, NYPD officers—including detectives and other high-ranking officers—continuously stop and arrest people in the Database on pretextual bases for so-called "quality of life" and low-level offenses, such as littering, spitting, or jaywalking, even though judges commonly dismiss these charges at the first court appearance.

212.    For example, the NYPD entered a Latino teenager into the Database as a member of a crew, based on unspecified allegations by two NYPD sources. Before he was 18 years old, he had been arrested by officers from the 42nd precinct over a dozen times, mainly for low-level offenses. None of these arrests resulted in a conviction and some did not even result in charges being brought. Yet, police in his neighborhood continued to arrest him and bring him to the precinct for questioning, often without filing charges. On information and belief, during a Civilian Complaint Review Board (CCRB) hearing, officers admitted that the Database was a key reason they repeatedly stopped this teenager. Officers further informed the teenager that he was added to the Database based on the people with whom he spent time—including childhood friends with whom he had grown up and who lived on the same block. Though the NYPD first added him nearly a decade ago, he remains in the Database to this day.

213.    Similarly, the NYPD entered a 15-year-old Black teenager in the Database, in part, because he spent time in a "known criminal group location" and "associate[ed] with known criminal group members." In 2022, NYPD officers stopped and arrested him for jaywalking, a

---

Crime Unit, which engaged in widespread abuses and is most known for killing Amadou Diallo. At the time of Diallo's death, evidence revealed that anti-crime officers were involved in a disproportionate number of shootings by police and other aggressive police practices, such as stop and frisk. Even as reconstituted, NST units have continued to unlawfully stop, frisk, and search people of color at staggeringly disparate rates.

charge which was ultimately dismissed. Following an investigation of the pretextual stop, the CCRB found that the officers engaged in biased-based policing and racial profiling. He remains in the Database to this day.

214.    Last year, the City Council voted to decriminalize jaywalking through city legislation, which passed after decades of discriminatory enforcement against Black and Latino persons and went into effect this year. In 2023, the NYPD issued 92% of all jaywalking summonses to a Black or Latino person. The City Council took action because "there is no evidence that over 90% of the jaywalking activity in the City is committed by persons from these communities."

215.    In justifying the Database, the NYPD has repeatedly stressed high *arrest* rates. For example, in February 2025, NYPD officials informed the City Council that while more than three quarters of people on the "active" Database—or more than 10,000 people—have never been convicted of a single felony, only 1% of people in the "active" Database have never been arrested. The NYPD declined to provide information about misdemeanor conviction rates.

216.    Moreover, the NYPD claims the Database is one tool used to investigate gun violence, but over two-thirds of people on the "active" Database have never been so much as suspected of perpetrating a shooting, contradicting this purported justification as well.

217.    Consistent with this discrepancy between arrests and convictions, almost a third of people listed as "active" on the Database—or roughly 4,000 people—have been placed under arrest by the NYPD on *20 or more* occasions. But these arrest rates do not correspond to similarly lengthy conviction records. Rather, on information and belief, these arrests—often for low-level offenses or non-criminal violations—often do not result in convictions even for nonfelony

offenses. Though the NYPD concedes that being on the Database does not provide reasonable suspicion to stop someone or probable cause to arrest them, these high arrest rates further demonstrate that the NYPD is targeting people on the Database, who are predominantly Black or Latino, for pretextual quality-of-life stops and arrests at alarming rates.

218.    On information and belief, NYPD officers continue to stop, arrest, and detain people based on their label as "criminal group members," even after they no longer appear on the "active" Database and instead are labeled as "inactive."

219.    For many people on the Database, these NYPD stops are so frequent—and begin at such an early age—that they cannot recall how many times the NYPD has stopped them.

220.    Multiple stops, intrusive encounters, and constant surveillance by police lead to increased trauma, anxiety, and feelings of worthlessness.[32] These harms are particularly acute for those who experience frequent police contact, regardless of whether they are arrested, and are further heightened when they were targeted because of their race and ethnicity because they are likely to be targeted again.[33]

---

[32] See, e.g., Rachel Swaner, 'We Can't Get No Nine-to-Five': New York City Gang Membership as a Response to the Structural Violence of Everyday Life, 30 CRITICAL CRIMINOLOGY, 95, 101; 106 (2022); see generally, Azure Thompson, et. al, Associations Between Experiences of Police Contact and Discrimination by Police in Courts and Health Outcomes in a Representative Sample of Adults in New York City, 98 J. URB. HEALTH, 727-741 (2021).
[33] Amanda Geller, et al., Aggressive Policing and the Mental Health of Young Urban Men, 104 AM. J. PUB. HEALTH 2321, 2321; 2324–36 (2014); see also, Denise Herd, Cycles of Threat: Graham v. Connor, Police Violence, and African American Health Inequities, 100 BOS. UNIV. L. REV. 1047, 1051 (2020) (demonstrating "significant associations between law enforcement encounters and a range of mental health problems" experienced disproportionately by Black people and other people of color, including anxiety, post-traumatic stress disorder, psychological distress, depression, and suicidal ideation and attempts).

221.    For those on the Database, frequent stops create an inescapable, oppressive police presence in their neighborhoods, causing some to fear physically leaving their homes and others to choose traveling in pairs or groups to feel less vulnerable.

### D. *Prolonged Detentions and Interrogations*

222.    The NYPD illegally subjects people in the Database to prolonged detentions and interrogations, as part of Operation Crew Cut and other Database-related policing strategies.

223.    Moreover, through the Database, the "gang" label follows people around the entire city, amplifying the harms of this label and escalating police encounters.

224.    As the OIG found, the "gang" or "crew" label assigned by the NYPD, along with other information from the Database, is "widely available throughout the NYPD."

225.    Specifically, "approximately 10,000 of NYPD's estimated 33,000 uniformed officers are able to view the information contained in the activation, renewal, or deactivation DD5s for each individual included in the [Database], which are accessible via the Enterprise Case Management System (ECMS)," a centralized repository of electronic information and files. These forms include profiles on every person entered into the Database, containing sensitive information such as histories of sealed arrests.

226.    As part of that platform, the NYPD also maintains the "Domain Awareness System" ("DAS"), a centralized repository of records which would "otherwise be kept isolated in different data compartments within the NYPD."[34]

---

[34] NYPD, Domain Awareness System Impact and Use Policy ("DAS IUP") 4 (April 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/domain-awareness-system-das-nypd-impact-and-use-policy_4.9.21_final.pdf.

227.    Through DAS, *any* uniformed officer can search a person's name and access an "Entity Report," or a summary of internal records about that person, including the names of the "gang" or "crew" (if any) with which they are allegedly "active" members of—information which is generated automatically from the Database.[35] Figure 9, below, is an example of how information from the Database appears in search results from DAS when accessed by any officer:



Figure 9: Sample DAS Search Result Showing Criminal Group Information From Database

---

[35]    OIG Report at 4, 26. The City of New York, Dep't of Investigation, (April 2023), https://www.nyc.gov/assets/doi/reports/pdf/2023/16CGDRpt.Release04.18.2023.pdf ("For example, if an officer runs a DAS search on the driver of a vehicle who has been stopped, the search request will go through all of NYPD data sources that the officer is permitted to access and return a list of results. If the driver has a record within the CGD, that result will be populated for the officer along with other relevant information. The CGD result will include the driver's name and criminal group membership[.]")

228.    Thus, any uniformed officer can enter a person's name on their Department-issued phone during a street stop and access the core allegations contained within the Database—the labeling of a person as an "active" member of a criminal group and which group they are alleged to be affiliated with—without authorization from a supervisor or a court. On information and belief, the NYPD trains its officers to use DAS to search the name of every person who is stopped or arrested, including during routine traffic stops.

229.    The existence of the "gang label" in DAS shapes officer perception of people they encounter in harmful and potentially dangerous ways. For example, New Yorkers labeled as gang members have been forcibly removed from their vehicles after officers search their names in DAS during otherwise routine traffic stops; others have been made to wait in the back of patrol cars with their hands cuffed while officers determine whether or where to hold them for further police action.[36]

230.    Once the NYPD arrests a person on the Database for "any offense"—including the types of low-level offenses described above, such as jaywalking or littering—officers hold that person on the street or at the precinct for possible interrogation about unrelated community activity.

231.    These prolonged detentions of people in the Database are conducted pursuant to official NYPD policy and widespread practice—hereinafter the "Detention and Interrogation Policy"—as part of the Department's directive to gather "gang intelligence." On information and

---

[36] Studies also show that police officers dehumanize those who are labelled gang members. For example, the Center for Court Innovation has reported "regularly hear[ing] officers refer to [people labeled as gang members] as 'criminals,' 'animals,' 'demons,' 'scum,' 'monsters,' and 'terrorists.'" Swaner, *supra* note 32 at 101.

belief, portions of this policy and widespread practice are outlined in the Patrol Guide (e.g., P.G. 212-13, "Reporting Gang-Related Criminal Activity; P.G. 202-16, "Field Intelligence Officers"), internal memoranda, public statements and testimony, and other training materials.

232.    Pursuant to the Detention and Interrogation Policy, the NYPD detains people in the Database for excessive periods—far beyond the time reasonably necessary to issue a summons, traffic ticket, or appearance ticket—and holds them for the sole purpose of interrogation.

233.    In practice, the NYPD takes individuals listed on the Database into custody and holds them for hours for offenses no more serious than spitting or littering that should otherwise result in receiving an appearance ticket at the scene of the initial police encounter.[37]

234.    When arrested for any offense, people on the Database are held in custody for detectives to determine whether to conduct a "debriefing" and, if the detective is not on location, to respond to the precinct or scene for the purposes of that questioning, if desired.

235.    During these interrogations, detectives question people on the Database about alleged criminal and other activity unrelated to their arrest. For example, detectives question people on the Database about who their friends are, where they hang out, what mode of transportation they use, and which schools they attend. Questions range from "Do you know X?" to "Who sells drugs?"

---

[37] Pursuant to CPL150.20(1)(a), passed in 2020, the NYPD is required to release any person arrested for an eligible low-level offense with an appearance ticket, in lieu of a custodial arrest, unless a statutory exception applies. As amended, CPL 150.20 (1) (a) provides that "[w]henever a police officer is authorized pursuant to section 140.10 of this title to arrest a person without a warrant for an offense other than a class A, B, C or D felony or a violation of section 130.25, 130.40, 205.10, 205.17, 205.19 or 215.56 of the penal law, he *shall*, except as set out in paragraph (b) of this subdivision, subject to the provisions of subdivisions three and four of section 150.40 of this title, instead issue to and serve upon such person an appearance ticket." (emphasis added).

236.    The NYPD patrol guide and other training materials define gang intelligence to include information about "a gang, suspected gang, an individual gang member, or suspected gang member" including, for example, information about "plans by persons affiliated with a gang to organize or take part in public events, community events." Training materials specify that this information extends to plans to "organize or take part in protests, marches, and other public events."

237.    FIOs collect and coordinate information about suspected gangs and crews, including through the debriefing of prisoners, both to build the Database and to continue gathering information from those individuals already in it. The NYPD encourages FIOs to collect broad personal information about each suspected person and group. In this way, minor arrests serve as an opportunity to seek information for the Database and to seize data about Black and Latino youth and their friends.

238.    Operation Ceasefire is an NYPD program that targets alleged group members based on their inclusion in the Database. On information and belief, when a person targeted for Operation Ceasefire is arrested anywhere in the City, an alert is sent to the relevant unit, triggering prolonged detention.

239.    On information and belief, pursuant to Operation Ceasefire, the NYPD has sent letters to people on the Database, threatening prolonged detention if they are arrested for any offense.

240.    As a result of this policy and widespread practice, for people on the Database, a traffic stop routinely lasts unreasonably long, and a stop for a quality-of-life offense can result in hours-long detention.

241.    For example, when testifying before City Council, one person revealed that he learned that he was still on the Database, despite being unaffiliated with a gang for at least ten years, when he was detained for questioning by detectives after being stopped for a traffic violation. He waited in an interrogation room for about five hours for gang detectives to come and question him.

242.    For many people on the Database, these interrogations happen so regularly that they can describe the interrogation room where they will be detained each time they are brought into a specific precinct. In the words of one public defender, "mother after mother report that their teenage sons keep getting seized by the same police officers for 'questioning' with charges rarely being filed."[38] Similarly, detectives report conducting hundreds of these "debriefings."

243.    On information and belief, NYPD officers continue to apply the Detention and Interrogation Policy to people even after they no longer appear on the "active" Database and instead are labeled as "inactive."

244.    Extended periods of detention have a destabilizing impact on young people's lives. Prolonged detention, resulting from inclusion in the Database, causes people to miss work and educational opportunities, including diversionary programming. At least one person held under

---

[38] Written Comments of the Bronx Defenders, New York City Council Hearing of the Public Safety Committee, Oversight – NYPD's Gang Takedown Efforts, at 2 (June 13, 2018), available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3506401&GUID=43D779AF-FAC6-4122-9886-87F19EAE5CC6&Options=&Search=uncil - File #: T2018-2108.

prolonged detention had to miss a court appearance because of the lengthy detention and interrogation, resulting in a warrant being issued for their arrest.

245.    These prolonged detentions and related invasive questioning cause significant trauma and emotional distress to those on the Database. Those on the Database describe the indignity of permanently being singled out as a "gang" member on the basis of race, the terror of police escalation, and the distress caused by the hours spent behind bars. This indignity and fear can persist even after someone is moved to the "inactive" list.

### E. Database Information Sharing

246.    Based on its policy and practice, the NYPD shares information from the Database about people's alleged gang ties with District Attorney's Offices, the New York City Departments of Correction and Education, including individual teachers and administrators, and other city agencies.

247.    Pursuant to official Department policy, the NYPD can and does share alleged gang affiliation—and other information on the Database—with members of the public and even the press. Because the NYPD in some instances shares this information with other agencies and the public, the stigma and harms that come from the gang or crew label follow people far beyond their interactions with officers.

248.    By policy, the NYPD permits officers to share "gang" labels from the Database broadly, and at their own discretion. Per the 2023 IUP, "information contained in the database may be provided to community leaders, civic organizations and the news media in order to further an investigation, create awareness of an unusual incident, or address a community-concern."

249.    By sharing Database information with the public, the NYPD stigmatizes young people by plastering the "gang label" across the internet. Even when criminal charges do not result in a conviction, these accusations persist. For example, one 16-year-old from the Bronx saw his gang label featured prominently in news headlines following his arrest. The police search that led to his arrest was later found to be unconstitutional, resulting in the full dismissal of all charges. Nevertheless, the articles about his arrest and alleged gang affiliation remain publicly available online for anyone to see.

250.    Pursuant to official policy, the NYPD makes Database information available to other city agencies on a purely discretionary basis. NYPD officers may communicate a gang designation to other city agencies if it is "designated as routine," has been approved as "further[ing] the purpose or mission of the NYPD," or is in "the best interests of the City."[39]

251.    Likewise, the NYPD shares information from the Database with federal law enforcement partners and task forces, including the Federal Bureau of Investigation ("FBI") and the U.S. Immigration and Customs Enforcement ("ICE"), for the purposes of criminal investigations.

252.    On information and belief, this information sharing can lead to a heightened risk of additional consequences, ranging from family separation to loss of public housing to deportation to the loss of or denial of employment.

---

[39] NYPD, Criminal Group Database, Impact & Use Policy (Oct. 13, 2023) at 9, www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/criminal-group-database-nypd-impact-and-use-policy-addendum_10.13.23.pdf.

253.    On information and belief, inclusion on the Database sometimes results in longer suspensions and other consequences for students in New York City schools, after NYPD officers are consulted about a student's suspected affiliation with a "gang" or "crew" during disciplinary proceedings—or even the suspected affiliation of their family members.

254.    The NYPD's policy also says it will share Database information specifically with prosecutors if "relevant to a criminal case." However, in practice, the "gang" label—"active" or "inactive"—routinely appears on arrest paperwork provided at arraignments in cases entirely unrelated to so-called "gang activity," such as cases alleging violations of New York's Vehicle and Traffic Law ("V.T.L."). *See infra* at Section VIII.A. For example, when officers turn over the standard "Entity Report" to prosecutors, *see supra* ¶ 227 & fig.9, the person's alleged gang affiliation is automatically included on the report if the person is on the Database.

255.    The NYPD's Patrol Guide requires the gang label to appear on various forms, including Complaint Report Worksheets and Complaint Follow-Up Informational forms, which the police regularly provide to the District Attorney's Offices. The NYPD communicates gang allegations to prosecutors as a part of the "daily" interactions between prosecutors and the NYPD. All this information sharing occurs frequently.

256.    Someone's presence in the Database can result in a range of negative consequences, from heightened bail or the denial of bail; to the revocation or denial of plea offers; to heightened conditions of parole, probation or supervised release; and, at times, ineligibility for diversionary programs. Public defenders report the withdrawal of favorable plea offers based on allegations that their client is "a known gang member."

257.    By policy and widespread practice, prosecutors issue "arrest alerts" when a person who has been labeled as a gang member is arrested, providing detailed information to officers in other precincts and District Attorneys in other counties. Those subject to such an alert are then flagged for "case enhancement" or targeted as "priority offenders." Per training materials from the New York County District Attorney's Office, prosecutors are instructed to "draft enhanced bail applications" and "elevate charges" among other enhancements based on these arrest alerts.

258.    On information and belief, people have been excluded from diversionary programs on the basis that they—or their family members—have been labeled as "gang" members. For example, in Manhattan, by policy and widespread practice, those labeled as "gang members" are categorically ineligible for diversion programs that offer a non-jail alternative for certain low-level offenses (e.g., Project Green Light, Manhattan HOPE, and Project Reset, a program targeted at teenagers arrested for low-level offenses) as well as for the Summons Initiative, which allows people to be issued summonses instead of being arrested for almost all non-penal law violations. Likewise, the New York County District Attorney's Office excludes those labeled as "gang members" from initiatives and policies to decline to prosecute low-level charges, such as marijuana possession (when possession was illegal) or subway farebeat cases.

259.    The NYPD has sent letters to people on the Database threatening heightened criminal penalties, including District Attorneys taking a "hard stance on plea positions for even the most minor offense," as well as possible probation violations. These "Ceasefire" letters identify the recipient as an alleged member of a purported criminal group without specifying the alleged

name or other identifying characteristics of the group. Recipients are further directed not to associate with members of the unidentified group.

260.    At times, the NYPD has targeted and timed these letters ahead of cultural events with significance to New York's Black and Latino communities. For example, in 2023, the NYPD sent letters to 40 people ahead of J'ouvert and the West Indian Day Parade, warning those targeted that they will be subjected to additional scrutiny should they decide to attend these public events.

## VIII.    *Inclusion on the Database Harms the Individual Plaintiffs.*

### A. *Plaintiff Adam*

261.    Plaintiff Adam confirmed that the NYPD had labeled him as a gang member after submitting a public records request pursuant to New York's Freedom of Information Law ("FOIL").

262.    Prior to that, Adam understood that he had been targeted as a member of an alleged criminal group after the NYPD delivered a "Ceasefire" letter to the home of his grandmother, which identified him as a member of an unspecified criminal group and directed him to stay away from other members.

263.    Adam was further warned that, as a result of this alleged group affiliation, he would be subjected to the above-mentioned enforcement actions, including but not limited to surveillance and prolonged detention.

264.    Database records reveal that the NYPD labeled him as "belonging" to a criminal group at least as early as 2015, when Adam was 21 years old, and around the time when he received the letter from the NYPD.

265.    The NYPD labeled Adam as a member of: Flocka Fam 900 Sumner Houses.[40] To date, Adam remains listed as an "active" member of the alleged group or groups in the Database.

266.    According to the activation paperwork, the police justified targeting Adam as a member of this alleged criminal group or groups based on both "Option A" and "Option B" of the activation criteria.

267.    Under Option A, the activation paperwork shows that the NYPD labeled Adam as a gang member based on the identification of "two independent sources," both NYPD officers. The basis for this identification is not further specified, and Adam has no way of contesting the allegations of these officers.

268.    Under Option B, the activation paperwork shows that the NYPD labeled Adam as a gang member based on: "Group related documents," "Known Groups Location," and "Association with Known Group Members."

269.    The Database records identify "Sumner Houses," the Bedford-Stuyvesant NYCHA development where Adam was born and raised, as a "Hang Out" and "Known groups location."

270.    Adam is very connected to the community within Bedford-Stuyvesant and within Sumner Houses, including through his involvement with local nonprofit programming and running an annual basketball tournament on the local court.

271.    On information and belief, the NYPD labeled Adam a gang member, at least in part, due to his close family relationship and physical proximity to his brother.

---

[40] It is unclear from the paperwork, whether the NYPD considers "Flocka Fam" and "900," to be one group or two separate organizations.

272.    "Flocka" is a nickname that friends and family used for one of Adam's cousins who passed away in 2011. After the cousin's death, Adam's family members and friends started using the phrase "Flocka Fam" as a way of honoring and remembering him. Many of the people who use this phrase to express their bond are family members of Adam.

273.    Adam has the letters "FF" tattooed above his left eyebrow as a reference to his deceased cousin. He also has a second tattoo which says "R.I.P. Flocka." His brother has a tattoo honoring their cousin as well.

274.    To Adam's knowledge, Flocka Fam is not a group assembled for the purpose of committing unlawful or criminal acts, and Adam is not a member of any such group.

275.    "900" is used by some as a reference to a group of buildings at Sumner Houses with building numbers starting with nine. The phrase "900" is a way of expressing the neighborhood bonds of friends and family members who grew up together. To Adam's knowledge, 900 is not a group assembled for the purpose of committing unlawful or criminal acts, and Adam is not a member of any such group.

276.    Law enforcement has advised Adam to stay away from family and friends who may be members of "Flocka Fam." He has further been directed by law enforcement to stay away from his own brother. At times, NYPD officers will bring his brother up for no apparent reason, for example, by asking how he is doing.

277.    Adam limits his relationships for his own protection and the protection of those he loves and cares about. Adam has avoided family members and neighbors for fear that the NYPD may label them as gang members for affiliating with him. Adam has further avoided family

members and neighbors for fear that they have been labeled as "gang" members or affiliates and thus his contact with them would give the police a reason to keep him on the Database or add him again if he is removed.

278.   Adam is pursuing a career in music and has previously collaborated with other artists to produce music videos for the music he writes and records. On at least one occasion, the NYPD approached an artist with whom Adam collaborated on a music video and questioned that artist about Adam, telling the artist that Adam was a member of a gang. Following the questioning by the NYPD, the artist stopped collaborating with Adam on music videos.

279.   Adam avoids writing music on topics which he fears the NYPD might associate with gang affiliation, and he also avoids including the same in his videos. He further avoids posting music lyrics on social media for fear that the NYPD might arbitrarily determine that the lyrics are an "admission" of gang or crew membership.

280.   Adam is aware that the NYPD monitors his social media, in part because, as frequently as once a day, he receives friend requests and messages from accounts which appear to be fake. At times, these messages contain threatening language apparently intended to elicit a response.

281.   For several years, and continuing today, the NYPD regularly and routinely surveils, detains, and interrogates Adam in and around Sumner Houses.

282.   As a result of the NYPD's actions, during the summer of 2024, Adam stayed home and did not spend time outdoors with his friends or anywhere near Sumner Houses to avoid police harassment and scrutiny. Adam no longer feels comfortable bringing his children to the playground

at Sumner Houses because he feels watched in those areas. To avoid exposing his children to the surveillance and harassment that he experiences, Adam asks his mother to take the children to the park so that they can play without police scrutiny.

283.    In September 2023, officers stopped Adam near Sumner Houses and arrested him for jaywalking under New York City Traffic Rule and Regulation 4-04 (c)(2) ("No pedestrian shall cross any roadway at an intersection except within a crosswalk"), a noncriminal traffic infraction.

284.    On information and belief, officers then ran his name in DAS, before taking him into custody at Public Service Area ("PSA") 3, which serves 22 Brooklyn-based NYCHA developments, including Sumner Houses.

285.    After holding him for over an hour at PSA 3, the NYPD took Adam to the 79th Precinct in Bedford-Stuyvesant and brought him to an interrogation room, where gang detectives interrogated him for roughly 10 to 15 minutes.

286.    The gang detectives questioned Adam about matters unrelated to the jaywalking violation, including whether he knew specific people by name and if he had seen them recently. Adam declined to answer questions and repeatedly informed detectives that he possessed no information relevant to any criminal investigation.

287.    In total, he was held in custody for roughly five hours before being released with a summons for jaywalking, returnable in the Summons Part.

288.    In December 2023, the jaywalking charge was dismissed in the interest of justice.

289.    Despite that dismissal, the NYPD continued to arrest Adam for the same underlying incident of jaywalking on multiple occasions, including most recently in June 2024.

290.    Adam has had similar experiences with both the 79th Precinct and PSA 3 on approximately eight occasions in the past three years: officers stop him for low-level offenses, including civil violations and traffic infractions, bring him to the precinct, and detain him for hours for the purposes of unrelated interrogations or "debriefings." At times, these extended, unreasonable detentions last as long as an entire day.

291.    During these detentions, officers consistently bring Adam from a holding cell to an interrogation room, where detectives interrogate him about unrelated crimes, other incidents in the neighborhood, and people whom he knows.

292.    At times, during these interrogations, detectives whom he does not recognize have greeted Adam familiarly, making statements such as "It's good to see you. I haven't seen you in a long time."

293.    These unreasonable and excessive detentions have followed stops and/or arrests for quality-of-life offenses such as jaywalking, littering, and spitting in a trash can, as well as traffic infractions such as sitting in the rear passenger seat without a seatbelt. Following these stops and/or arrests, officers generally release him with a summons, traffic ticket, or with no charges filed against him.

294.    Most recently, in February 2025, Adam was stopped on his way home from a funeral following the death of a childhood friend by suicide. Adam was a passenger in the backseat of a vehicle stopped between Myrtle and Marcy Avenues in Bedford-Stuyvesant, near Sumner Houses, purportedly for a traffic infraction. Plaintiff Adam, the driver, and two other passengers were all removed from the vehicle, searched, handcuffed, and brought to PSA 3. Adam was held

for approximately one hour before being released with a traffic ticket for failure to wear a seatbelt in violation of V.T.L. § 1229-C.

295.    On information and belief, the initial traffic stop was made by a group of detectives, who identified all four young men by name upon stopping the vehicle.

296.    Adam was informed that they were brought to the precinct because they were "on the Ceasefire list," a list which the NYPD has publicly claimed relies on information from the Database.

297.    Adam was further informed that the directive to detain people on the Ceasefire list for prolonged periods was coming from the Office of the Mayor.

298.    On other occasions, detectives or command-level officers have stopped Adam allegedly for low-level offenses or traffic violations, such as noise complaints, open container violations, cannabis, or mere presence near the playground in Sumner Houses, and detained him on the street for far longer than necessary to effectuate the stop and determine whether to issue a ticket or make an arrest.

299.    On these occasions, officers have held Adam for upwards of 20 minutes, for the sole purpose of questioning him about general activity in the neighborhood unrelated to the underlying basis for the stop. During these interrogations, officers have withheld his license or otherwise expressed that he is not free to leave.

300.    Following these stops, police ultimately release Adam with a summons or traffic ticket, or, more frequently, with no charges filed against him. At times, the police offer no justification at all for the stop, and release Adam without documentation or charges.

301.    On many of these occasions, officers who already know that Adam is in the Database have stopped him, addressed him by name, and, at times, accused him of being a "gang member." Often, these officers wear plain clothes and drive unmarked black vehicles.

302.    On information and belief, other NYPD officers on other occasions have prolonged or escalated stops after searching Adam's name in DAS.

303.    The NYPD has subjected Adam to these unreasonable and excessive detentions at an alarming frequency. For example, officers stopped, detained, and questioned Adam more than five times during May 2024 alone. On nearly every occasion, police have stopped Adam in and around Sumner Houses.

304.    Because the NYPD pulls him over nearly every time he gets into his car, Plaintiff Adam has begun to avoid driving, though he is legally permitted to do so.

305.    Like other members of the putative class, the police regularly harass and stop Adam's family members, friends, and neighbors who are on the Database.

306.    Adam has experienced significant emotional distress and lasting trauma as a result of the continued racial targeting by police, the frequent and excessive detentions, and the harassment and surveillance that precedes the detentions.

307.    Adam no longer feels comfortable in his own environment in and around Sumner Houses. As a result, he no longer feels free to use common areas and courtyards in the housing complex, or to walk or drive around the neighborhood. At times, this distress has become so acute that Adam has been scared to leave the house or has moved to a hotel temporarily at great personal expense.

308.    Adam has also been working to build a stable life for his family, an effort which has been made impossible by the unrelenting NYPD harassment. For example, Adam has missed or been late to weekly meetings with a program—for which he is paid a stipend and through which he obtains career development and other services—because he has been in the custody of the NYPD.

309.    On information and belief, officers conduct these repeated stops and subsequent interrogations pursuant to the City's Detention and Interrogation policy set forth above, and they do so directly as a result of Adam's inclusion in the Database.

310.    Adam is a Black man, who, on information and belief, was added to the Database and subjected to the aforementioned enforcement actions, at least in part, on the basis of his race.

### B.  *Plaintiff Bryan*

311.    In 2019, Plaintiff Bryan first became aware that he had been labeled as a "gang" member after a family member saw his picture on a bulletin board displayed in plain sight near the entrance to the 121st Precinct, serving the northwestern shore of Staten Island, including Mariner's Harbor.

312.    At the time, the precinct displayed Bryan's photo along with photos of other people on a document labelled "intelligence alert . . . Harbor Gang (members)." Officers further marked photographs of people who were incarcerated with a "prohibited" sign, and highlighted photographs of people who were deceased.

313.    After learning that he had been labeled as a member of "Harbor Gang," Bryan moved to North Carolina in 2019 to avoid being targeted by the NYPD. He returned to Mariner's Harbor in February 2023 to reunite with his family after the death of his father.

314.    When he returned, the NYPD continued to surveil Bryan as a member of "Harbor Gang," an alleged criminal group.

315.    Days before his father's funeral, NYPD officers saw him entering a corner store. After exiting the store, Bryan entered his vehicle and began to drive away. He was immediately pulled over by NYPD officers. At first, officers refused to explain the reason for the stop, demanding his license. Once he provided his license, Bryan was informed that he had been stopped because he was not supposed to park in front of the store.

316.    Bryan was brought to the 121st Precinct and held in a cell for hours, until a detective was brought in to question him about unrelated events and people in the neighborhood, including a young rap artist from neighboring Arlington, who had no connection to the traffic infraction for which he was stopped.

317.    Paperwork from his arrest, including the Verification / Arraignment Card, identifies Bryan as a "known Harbor Gang Member."

318.    Ultimately, Bryan was charged with aggravated unlicensed operation of a motor vehicle under V.T.L. § 511(1). NYPD records indicate that officers identified and processed Bryan's arrest as one for which an appearance ticket must be issued, pursuant to C.P.L. § 150.20(1)(a).

319.    Yet, Bryan was not released promptly with an appearance ticket, but rather was held for an unreasonable period for the sole purpose of unrelated questioning. Moreover, though the arresting officer completed the appearance ticket at 3:00 p.m., the ticket was not presented to Bryan to sign until one hour later.

320.    As he waited for his release, Bryan feared he would miss the service for his father.

321.    In 2023, Bryan submitted a public records request pursuant to New York's FOIL. At that time, the NYPD confirmed that it labeled Bryan as an "active" member of a criminal group. Specifically, the NYPD labeled him first as an "associate" and then as a "member of" "Harbor Gang," beginning at least as early as 2017, when Bryan was 18 years old.

322.    On information and belief, between November 2023 and June 2024, Bryan was moved to a list of "inactive" members of criminal groups within the Database.

323.    According to the activation paperwork, the NYPD added Bryan to the Database seemingly under Option B, based on the criteria of "known groups location," "as[s]ociation with known group members" and "scars/tattoos associated with groups." Bryan has no tattoos or distinctive scars. The activation paperwork indicates that the NYPD relabeled Bryan from an associate to a Harbor Gang Member, based on investigation and conferral with the 121 FIO.

324.    On information and belief, the NYPD labeled Bryan as a member of "Harbor Gang" and added him to the Database, at least in part, because he associated with his own cousin, whom the NYPD added to the Database in 2014, when Bryan was still a child.

325.    The NYPD identified Bryan's cousin as a member of "Harbor Gang" based on social media posts, including a photo with Bryan, that includes a graphic design celebrating

"Harbor World," a reference to the shared community in Mariner's Harbor Houses where they grew up together.

326.    Bryan is very connected to his community within Mariner's Harbor and, before deciding that he needed to take steps to avoid harassment from the police, frequently hosted barbecues and attended community events in this NYCHA complex.

327.    On information and belief, the NYPD labeled Bryan as a gang member, in part, because of his frequent presence at his home in Mariner's Harbor Houses. Database documents also identify "Mariner's Harbor," the NYCHA development, as a "Hang Out" and "Frequent Location" of Bryan.

328.    The City has further labeled "Mariner's Harbor housing complex" as a "Staten Island Youth Crew."

329.    To Bryan's knowledge, "Harbor Gang" is not a group assembled for the purpose of committing unlawful or criminal acts. Bryan is not a member of any such group.

330.    For Bryan and his friends and family, using the phrase "Harbor Gang" or "Harbor World" is a way of expressing community pride. Harbor World represents kids from the neighborhood getting along and engaging in activities, such as sports, music, singing, and dancing.

331.    The NYPD frequently harasses Bryan through his social media accounts, including officers posing as someone he knows and sending "friend requests." For example, Bryan received one message from a "friend," asking "how have you been?" Bryan knew the message was not from his friend, because his friend had a different account name. The messages often escalate from questions like "how have you been" to "where the guns at?"

332.    For several years, and continuing today, Bryan has been surveilled, detained, and interrogated by the NYPD in and around the housing complex where he grew up. Police frequently stop and harass him at Mariner's Harbor Houses, leaving him nowhere to spend time with his friends and family in his own neighborhood. As soon as he starts gathering with friends and family in the complex, NYPD officers arrive to separate them or to be close to the group, making them feel uncomfortable. Bryan often feels as if the NYPD is punishing him for spending time around his family because the NYPD also harasses and surveils family members. For example, in recent years, the police have pulled Bryan over nearly every time he drove his cousin to catch the ferry to Manhattan for work.

333.    Bryan no longer feels comfortable bringing his daughters to the playground in Mariner's Harbor Houses because he is afraid of the NYPD watching his daughters, his daughters witnessing a traumatic interaction with officers, or otherwise putting them at a heightened risk due to the police presence surrounding his home.

334.    This fear became reality in June 2024, when Bryan brought his newborn daughter to Family Day, an event hosted annually by NYCHA to celebrate the community by bringing children together for a day of play.

335.    During the event, Bryan observed an NYPD patrol car circling the area where he and his fellow community members had gathered. He began to fear police harassment and, worried about his newborn daughter, decided to take his family home.

336.    At roughly 4:30 p.m., shortly after the family entered their vehicle, officers made a sudden U-turn in his direction. Bryan began pulling over to get out of their way, but instead of passing, the patrol car approached his vehicle.

337.    After requesting his license and registration, officers alleged that Bryan had failed to properly signal when pulling over to let them pass, claiming he had not turned on his blinkers. Officers then placed Bryan under arrest.

338.    While Bryan stood helpless and handcuffed, officers approached the side of the car where his two-week old daughter sat in her car seat and opened the door. Officers tried to remove his daughter from the vehicle and to grab her stroller. Ultimately, his daughter was left with her mother, who had just given birth, to wait on the sidewalk without a ride home, as Bryan and the family vehicle were transported to the precinct.

339.    Though Bryan is no longer designated as an "active" member of "Harbor Gang," the arresting officer documented in the Complaint Report Worksheet that Bryan is "a known Harbor Gang member," shortly after making the stop. This designation was further noted in the Arrest Report and Court Verification / Arraignment Card, both of which were provided to the District Attorney's Office.

340.    Moreover, the Arrest Report identified Bryan as a suspected member of "Harbor Gang" based on pictures on social media and his alleged association with known gang members. On information and belief, these allegations are based on information within the Database.

341.    On information and belief, Bryan was targeted by units tasked with responding to "gang" activity. According to the paperwork, the arresting officer was assigned to the anti-crime

unit, a predecessor unit to the Neighborhood Safety Teams, that was disbanded in 2020, following several heavily criticized police shootings and concerns of unconstitutional police practices. Paperwork further indicates that roughly eleven officers were involved in the traffic stop.

342.    Bryan was charged with aggravated unlicensed operation of a motor vehicle under V.T.L. § 511(1). NYPD records indicate that officers identified and processed Bryan's arrest as one for which an appearance ticket must be issued, pursuant to C.P.L. § 150.20(1)(a).

343.    Yet, rather than processing the appearance ticket in a reasonable time and promptly releasing Bryan, officers imprisoned him for roughly three hours, without justification solely so that he would still be in their custody when a detective came to interview him.

344.    Though the arresting officer completed the appearance ticket around 6:00 p.m., the ticket was not presented to Bryan to sign until nearly one hour later.

345.    While he was detained, a detective entered Bryan's cell and interrogated him for about unrelated matters and activity in the neighborhood. Specifically, the detective questioned Bryan about noncriminal matters, such as whether he knew specific people from Mariner's Harbor Houses and about his relationship to them. The detective further interrogated him about the existence of "Harbor Gang" and whether there is a new group of young people involved. Bryan declined to answer questions and repeatedly informed the detective that he possessed no information relevant to any criminal investigation.

346.    Bryan was ultimately released with an appearance ticket and with his vehicle.

347.    The 121st Precinct has subjected Bryan to prolonged detentions and interrogations at the precinct on at least three occasions since he returned to Mariner's Harbor in 2023, each time

following stops for low-level offenses and traffic infractions. These detentions occurred when Bryan was on the "active" list of the Database and have continued even after Bryan was placed on the Database's "inactive" list.

348.    Nearly every time, officers have brought Bryan into the precinct during the day and held him until the evening. During his detention, detectives have repeatedly interrogated Bryan about unrelated crimes and other events in the neighborhood, as well as his relationships with people in the community.

349.    These unlawful and excessive detentions have primarily followed stops for traffic infractions, such as passengers without a seatbelt or failure to signal. Following these arrests, officers ultimately release Bryan with an appearance ticket or traffic ticket.

350.    Arresting officers routinely and erroneously note that Bryan is "a known Harbor Gang member" on arrest paperwork, including after Bryan was moved to the Database's "inactive" list. On information and belief, at times these notes are auto-populated through the Enterprise Case Management System.

351.    On still other occasions, officers in plain clothes or uniform white shirts, indicating rank, and unmarked vehicles have stopped Bryan for traffic violations, such as having a broken license plate light or brake light, and subsequently detained him on the street for far longer than necessary to effectuate the stop and determine whether to issue a ticket/summons or make an arrest. Bryan checked the lights after the stop and saw no issues with his vehicle.

352.    The NYPD unlawfully and excessively detains Bryan during routine traffic stops as frequently as every other month. On nearly every occasion, these stops occur in and around Mariner's Harbor Houses.

353.    During these stops, officers hold Bryan for upwards of 30 minutes without justification and for the sole purpose of questioning him regarding generalized criminal activity and other events unrelated to the underlying basis for the stop, while withholding his license or otherwise expressing that he is not free to leave. For example, Bryan has been asked, "We know you know where the guns are."

354.    Following these stops, the NYPD ultimately released Bryan with a traffic ticket, or, more frequently, with no charges or citations.

355.    Police stop Bryan as both a driver and passenger and subject him to these same interrogations. At times, when Bryan is a passenger in the vehicle, officers single him out for interrogation and search. Many of these stops occur within seconds of his entering a vehicle or the moment the vehicle pulls onto the road. On at least one occasion, officers stopped the car while it was parked.

356.    On one occasion, officers stopped a rideshare in which Bryan and his cousin, who is also on the Database, were passengers. Officers proceeded to question the passengers only about where they were traveling. The driver was released without a ticket.

357.    In April 2024, Bryan was a passenger seated in the backseat of a parked vehicle when a group of officers in plain clothes blitzed the vehicle, approaching suddenly and from all sides. The officers ordered every passenger out of the vehicle and demanded Bryan's

identification. Officers then singled out Bryan for a pat down and search. He was held in the middle of the street for roughly an hour.

358.    The officers justified the stop by claiming the vehicle was parked near a fire hydrant, yet they issued no ticket.

359.    On multiple occasions, officers stopping Bryan recognized him by name and face while making the stop. Officers have also indicated their recognition of the license plate of Bryan's vehicle. On other occasions, officers prolong these stops once they search Bryan's name in their devices.

360.    At times, officers have made threats toward Bryan and members of his family, including driving by and yelling their names, pointing "finger guns" at them, and shouting "we know who you are" and "we are coming for you."

361.    This harassment occurs at community events, including barbecues, basketball tournaments in Mariner's Harbor Houses, and a recent candlelight vigil for a neighbor who passed away.

362.    On information and belief, NYPD officers harass and excessively detain Bryan's family members, friends, and neighbors on the Database just as frequently.

363.    Bryan has experienced significant emotional distress and lasting trauma as a result of this racial discrimination, frequent and excessive detention, and the harassment and surveillance that precedes that detention.

364.    Bryan no longer feels free to move about Mariner's Harbor Houses or to come and go freely from the neighborhood. He no longer feels comfortable at community events such as Family Day. Whenever possible he chooses to travel in pairs or groups to feel less vulnerable.

365.    Bryan was labeled as a member of "Harbor Gang" based on where he lives, who he spends time with in the housing complex he calls home, and his and others social media activity. As a result, he fears that, at any time, he is likely to again be labeled as an "active" member of a criminal organization based on these same justifications. As a result, to avoid reactivation he stays home as much as possible and avoids spending time with people from the neighborhood and Mariner's Harbor Houses, including childhood friends. Bryan's friends have commented that they don't see him as frequently because he takes every step that he can to avoid police harassment and surveillance.

366.    Bryan feels embarrassed and afraid when officers single him out in front of his family. In particular, he fears what will happen to his children if he is brought to the precinct while he is taking care of them on his own.

367.    On information and belief, the NYPD conducted these repeated stops and the interrogations that follow, as a result of Bryan's inclusion in the Database and pursuant to the City's Detention and Interrogation policy.

368.    Bryan is a Black man, who, on information and belief, was added to the Database and subjected to the aforementioned enforcement actions, at least in part, on the basis of his race.

### C. Plaintiff Chris

369.    Plaintiff Chris learned that the NYPD listed him as a gang member in the Database after submitting a public records request pursuant to New York's FOIL.

370.    Chris is currently employed by the New York City Fire Department as an Emergency Medical Technician. He was previously employed by the New York City Department of Education as a student aide and basketball coach for middle school and high school students. He would like to one day become a firefighter.

371.    Database records reveal that the NYPD labeled him as a member of a criminal group beginning in 2015, when he was 19 years old. Specifically, the NYPD labeled Chris as a member of alleged criminal group. FOIL records indicate Chris remains listed as an "active" member of the alleged group in the Database to date.

372.    According to NYPD paperwork, Chris was targeted as a criminal group member, based on both "Option A" and "Option B" of the activation criteria.

373.    Under Option A, the activation paperwork shows that the NYPD activated Chris as a gang member based on the "identification" of "two independent sources," both NYPD officers. The basis for this identification is not further specified, and Chris has no way of contesting the allegations of these officers.

374.    Under Option B, the activation paperwork shows the NYPD activated Chris as a gang member based on: "Group related documents," "Known Groups Location," and "Association with Known Group Members."

375. Database records identify "Gowanus Houses," the NYCHA development where Chris lived as an adolescent, as a "Hang Out" and "Known groups location." Chris went to Brooklyn Collaborative Studies in the community around Gowanus Houses and continues to have significant ties in the neighborhood.

376. On information and belief, the NYPD labeled Chris a gang member and entered his information into the Database when he was falsely accused of attempted murder. Chris spent two years incarcerated on Rikers Island while awaiting trial before he was ultimately acquitted of all charges.

377. Chris is alleged to be a member of a purported group that shares the name of a popular song. This song may be the origin of what NYPD is alleging to be a gang name. To Chris's knowledge, any group bearing that name is not a group assembled for the purpose of committing unlawful or criminal acts. Chris is not a member of any such group.

378. To Chris and his friends, the phrase alleged to be a criminal group's name, at most, referenced people within his community who were popular at local parties. To the extent any social group was associated with the phrase, it was one that predated Chris by several years and was not part of his social network.

379. Chris is aware that the NYPD monitors his social media channels. When he was arrested in 2015, the police showed him a picture of himself and his cousin from social media. He also knows that the NYPD possesses images of him attending baby showers and other community events. He does not use social media as much as he would like to for fear of unwarranted surveillance and heightened attention to him.

380.    Though he grew up at Gowanus Houses in Brooklyn, he now lives in East Flatbush with his mother and sibling. Chris has avoided the area around the Gowanus Houses for fear of police scrutiny. As a teen in Gowanus, Chris often encountered police and did his best to avoid them. He recalls officers antagonizing him and his friends through a loudspeaker. Officers would yell out phrases and the names of people he knew. They would also try to instigate conflict by talking about unknown third parties and saying unusual things like "the Boogeyman is back. What are y'all going to do?" Chris did not know who officers were referencing in these statements.

381.    Chris's grandfather still resides at Gowanus Houses in Brooklyn. Chris lived there with his grandparents on and off until 2017. Today, Chris is reluctant to visit his grandfather at Gowanus Houses, despite his grandfather's inability to travel outside his home, for fear of police interaction. In particular, Chris no longer feels comfortable visiting his grandfather at night. He only visits if he has his car and if it is broad daylight. When he visits his grandfather, he mostly stays inside. If Chris is still there by nighttime, he will stay the night to avoid police contact.

382.    Chris knows that being on the Database will alter the typical dynamic of any stop, even if it is routine.

383.    In 2017, Chris gave his girlfriend a ride to a house party in Bushwick. While he waited for her in his parked car, an unmarked car drove by a few times, and then abruptly turned around. Five or six officers in vests suddenly emerged from other unmarked cars and approached him. One of them directed his flashlight into Chris's car and demanded identification. Two officers walked away with his identification, and, upon running Chris's name through his device, one officer remarked that Chris was in a gang. Another officer asked from where, and the first officer

remarked "not from around here." The officers ordered Chris to "get out of here" and then drove away.

384. Also in 2017, Chris was a passenger in a car stopped by the NYPD in Bay Ridge. At the time, he worked for a car sharing company and, along with a coworker, was on his way to transport a car rental from one location to another. This was his second shift for the day, as he also worked for a building maintenance company. Chris and the driver noticed police lights behind them and pulled over. Though the coworker was driving the vehicle, the officers approached the car from both sides, and one of them interrogated Chris. The officers stated that the car smelled like marijuana, asked Chris and his coworker to exit the vehicle, and then ultimately searched the vehicle after Chris and his coworker consented. Though Chris was merely a passenger in the vehicle, the officer asked for his identification along with the driver's. The officer went back to his car with the identification and ran both names through his device. On information and belief, upon reviewing the results on DAS, the officer observed that Chris was on the Database and called an NYPD supervisor. After making that call, instead of returning to question the driver, the NYPD officers went to Chris specifically and searched his pockets. When they discovered a small pocketknife Chris used to cut boxes in his building maintenance position, they detained and arrested Chris. He spent more than twelve hours in custody and was unable to work his building maintenance shift the next day. He was charged with possession of a weapon, but the charge was ultimately dismissed.

385.    On information and belief, this stop, search, and subsequent arrest were conducted pursuant to the City's Detention and Interrogation policy set forth above and flow directly as a result of Chris's inclusion in the Database.

386.    Chris has experienced significant emotional distress and lasting trauma as a result of this racial discrimination and surveillance.

387.    Chris is a Black man, who, on information and belief, was added to the Database and subjected to the aforementioned enforcement actions, at least in part, on the basis of his race.

## IX.    The City of New York Continues to Inflict Harm through its Database Policies and Practices Despite Years of Complaints.

388.    Before the OIG report in 2023, and since at least 2018, the NYPD and the City have been aware of concerns about the likely illegality of their policies and practices regarding the Database. After the NYPD was forced to reveal the existence of the Database to the public, civil rights organizations, local organizers, and public officials consistently raised concerns that the Database policies and practices violated constitutional and statutory law.

389.    In February 2018, a coalition of over two dozen public defender and police accountability groups publicly questioned the constitutionality of the NYPD's gang policing program and complained about the NYPD intentionally targeting communities of color and those living in public housing.

390.    As discussed, *supra* at ¶¶ 121-130, in June 2018 and June 2019, the New York City Council Public Safety Committee held oversight hearings and raised constitutional concerns about the vagueness of the criteria for entry into the Database, the extreme racially disparate impact of the Database, and the harmful consequences of inclusion on the Database. Then-Chairperson

Donovan Richards raised concerns about the NYPD policy and widespread practices related to the Database serving as a successor to the unlawful Stop and Frisk policies that a federal court banned after finding constitutional violations. Richards also raised concerns about the likelihood that officers harbor racial bias, implicit or otherwise, when identifying people as alleged gang members.

391.    At the same oversight hearings, a panel of community members, legal advocates, and academics echoed these complaints about the vagueness of the Database criteria, the racially disparate impact of the Database, and the impact and negative consequences of inclusion on the Database. They also complained about the NYPD's policy and widespread practice of detaining people on the Database for unreasonable periods for the purposes of generalized interrogations or "debriefings" following an arrest or stop for any offense, surveilling people, especially near their homes, and selectively targeting them for pretextual stops for low-level offenses such as jaywalking, all because the NYPD labeled the person a gang member.

392.    In 2019, the Policing and Social Justice Project, a Brooklyn College-based collaboration of faculty, students, and community organizations that uses research and advocacy to produce safer and more just communities, issued a report on the NYPD's gang policing tactics and the Database. It criticized the NYPD's criteria for labeling Black and Latino people as members of a criminal group and detailed several consequences of being entered onto the Database. It included, as among its recommendations: dismantling the Database and ending the use of social media and other forms of digital surveillance for gang policing.

393.    In 2020, a coalition of organizations and academics drafted a public letter raising constitutional concerns about the NYPD's gang policing. Similar to complaints preceding it, the letter noted: "This surveillance brands the individuals living in these communities as inherently suspicious, limiting their ability to move freely or associate with their friends and relatives without the government's watchful eye following them. We believe the Gang Database's vague and subjective standards makes it unreliable as an investigative tool and results in ongoing discrimination against Black and Latino New Yorkers."

394.    In 2021, the New York City Bar Association drafted a similar letter raising concerns that "overbroad criteria for placement in the Gang Database, combined with a lack of process and severe consequences for individuals listed therein, disproportionately and unjustifiably harm Black and Latinx people."

395.    In 2021, the NAACP Legal Defense Fund, the Legal Aid Society, the Bronx Defenders, and the Center for Constitutional Rights issued a public comment to the NYPD's proposed Impact and Use Policy for the Database. This letter also highlighted the constitutional concerns regarding the use and maintenance of the Database and asked the NYPD to eliminate the Database, end its gang enforcement policies and practices that rely on the Database, stop assigning gang affiliation based on racially discriminatory criteria, cease use of gang labels as the basis for enforcement, and end digital surveillance policies and practices that disproportionately impact youth of color.

396.    As of 2025, the NYPD has not adopted the recommendations described above. The harms and concerns that were publicly raised also remain. In February 2025, the New York City

Council Public Safety Committee again invited public testimony on the Database. The testimony from those harmed by the Database, or advocating on behalf of those harmed, mirrored prior complaints of racial discrimination, arbitrary inclusion, selective enforcement, and unlawful seizures. One person testified that children as young as 11 are stopped, questioned, and frisked because they are in the Database. Despite occurring eight years after the first City Council hearing on the Database, complaints of illegal policing remained the same.

**X.    *The Policies Set Forth Above Are the Policies of Defendant City of New York.***

397.    The City of New York and its police department developed and maintained formal (written) and de facto (unwritten) interrelated policies, widespread informal practices, and/or customs, which are set forth above.

398.    The City, by its agencies and officials, deprived Plaintiffs of their constitutional and statutory rights as a matter of official municipal policy and/or informal custom so pervasive and widespread as to practically have the force of law.

399.    Defendants have carried out these interrelated policies and widespread practices, at least in part, because of the racially discriminatory effects they have on Black and Latino people, and officials with final policymaking authority have intended these effects to occur.

400.    Defendants' policies and widespread practices regarding the Database are not the least restrictive means of accomplishing any compelling governmental purpose.

401.    Defendants subject the Plaintiffs, and the putative class, to unequal enforcement of law, insufficiently clear and arbitrarily enforced policies, excessive detention, and infringements on their rights to free speech, expression, and association, at least in part, because of the racially

discriminatory effects they have had on Black and Latino people, and officials with final policymaking authority have intended these effects to occur.

402.    The City has failed, and continues to fail, to adequately train NYPD officers on the legal and factual bases for designating individuals as members of a criminal group and conducting surveillance, stops, frisks, searches, and detentions that comply with the U.S. Constitution, the New York State Constitution, and the New York City Administrative Code. This failure has resulted in deprivation of people's constitutional rights.

403.    The City has failed and continues to fail to supervise NYPD officers, including but not limited to, by failing to discipline officers who violate people's constitutional rights through the conduct described above, resulting in deprivation of people's constitutional rights.

404.    The City's failures to adequately train, supervise, and/or discipline are deliberately indifferent to people's rights to remain free from: discrimination on the basis of race, ethnicity and/or national origin; insufficiently clear and arbitrarily enforced policies that violate due process; excessive detention; and infringements on their rights to free speech, expression, and association. The City is deliberately indifferent to the known, obvious, and highly predictable consequences that result when officers are not trained, supervised, or disciplined.

405.    Plaintiffs and the Plaintiff Class have been injured proximately and directly by the Defendants action and inaction. They have been subjected to discrimination on the basis of race, ethnicity and/or national origin, undue process on account of insufficiently clear and arbitrarily enforced policies, excessive and prolonged detention, and infringements on their rights to free speech, expression, and association. Additional harms include, but are not limited to: enhanced

probation conditions and intensive pre-trial monitoring; police surveillance; enhanced criminal charges and diminished plea offers; and prejudicial admission of Database membership information in criminal proceedings, leading to increased conviction and incarceration.

406.    Because Defendants' policies and widespread practices subject Plaintiffs and the Plaintiff Class to repeated surveillance, monitoring, and harassment on the basis of characteristics beyond their control—including without limitation their perceived racial and/or ethnic identity, where they grew up, their family, and their neighborhood ties—named Plaintiffs and the Plaintiff Class cannot simply alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD.

407.    Unless restrained by order of this Court, a real and immediate threat exists that the rights of Plaintiffs and the Plaintiff Class will continue to be violated in the future by the NYPD's official policies and widespread practices.

## CLASS ACTION ALLEGATIONS

408.    Plaintiffs 1-3 bring this action on their own behalf and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following class: All Black and Latino people who have been, or will be, labeled as a member of a "crew," "gang," or "criminal group," and entered into the NYPD's Criminal Group Database.

409.    All four requirements of Rule 23(a) are satisfied:

   a.   *Numerosity*: Joinder of all class members is impracticable because of the size and fluid nature of the class. The Database lists at least 26,000 Black and Latino people as "active" and "inactive" criminal group members.

b. _Commonality_: There are questions of law and fact common to all members of the class, including, but not limited to: whether Defendants' policies and practices for populating, maintaining, and enforcing the Database discriminate based on race, ethnicity, and/or national origin in violation of the United States and New York State Constitutions and the New York City Administrative Code; whether Defendants' policies and practices for populating the Database are impermissibly vague in violation of the United States and New York State Constitutions; whether Defendants' policies, and practices for populating, maintaining, and enforcing the Database infringe upon the free speech, expression, and association rights of the people on the Database in violation of the United States and New York State Constitutions; and whether Defendants' policies and practices for enforcing the Database, including the Detention and Interrogation Policy, unreasonably delay the release of people on the Database from NYPD custody in violation of the United States and New York State Constitutions.

c. _Typicality_: The claims of the named Plaintiffs are typical of those of the class. The named Plaintiffs, like all class members, have been subjected to the Defendants' policies and practices and have been injured by Defendants' conduct, and require similar relief.

d. _Adequacy of Representation_: The named Plaintiffs and class counsel will fairly and adequately represent the interests of the class. The named Plaintiffs have

suffered injury and are committed to obtaining declaratory and injunctive relief that will benefit the entire class by addressing the policies and practices regarding a centralized Database and enforcement through this Database citywide. Their interests are not antagonistic to those of other class members. Class counsel have many years of combined experience in complex civil, civil rights, policing, and class action litigation.

410.    Class-wide declaratory and injunctive relief are appropriate under Rule 23(b)(2) because the Defendants have acted or refused to act on grounds applicable to the class as a whole.

## CLAIMS FOR RELIEF

### COUNT I: Violation of the Fourteenth Amendment Right to Equal Protection
### U.S. Const. amend XIV; 42 U.S.C. § 1983
### (All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)

411.    Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

412.    Defendants have implemented, enforced, encouraged, and sanctioned policies, widespread practices, and customs of using discriminatory policing tactics to target the named Plaintiffs and members of the Plaintiff class for inclusion in the Database and subsequent law enforcement actions emanating from their entry in the Database, based, at least in part, on their race, ethnicity, and/or national origin, in violation of the Fourteenth Amendment to the U.S. Constitution.

413.    Moreover, the Database and the associated criteria for entering a person onto the Database were motivated by, perpetuate, and further entrench discriminatory and baseless stereotypes which criminalize Black people and Latino people.

414.    The history of the Database, the sequence of events, and the contemporaneous statements and actions of the NYPD and City officials, among other factors, raise a strong inference of a discriminatory purpose.

415.    The NYPD instructs and trains officers to target specific people, communities, and groups of people for potential inclusion in the Database and subsequent law enforcement action, based, at least in part, on their skin color, national origin, and/or ethnicity. The NYPD also intentionally applies the criteria for inclusion on the Database in a discriminatory and racially-disparate manner. As a result, Defendants' policies and widespread practices regarding the Database violate the Equal Protection Clause of the Fourteenth Amendment.

416.    Defendants created the Database and the related policies and practices. at least in part, with a purpose of discriminating against Black and Latino through a disparate and discriminatory impact on Black and Latino people.

417.    Data indicate that Defendants' Database-related policies and widespread practices have a discriminatory effect on Black and Latino communities and that Black and Latino people are included in the Database, and thus subject to related law enforcement actions based on the Database, at far higher rates than similarly situated white people.

418.    The known and reasonably foreseeable discriminatory impact of the Database on Black people and Latino people, among other factors, raise a strong inference of a discriminatory purpose.

419.    On information and belief, the NYPD created the Database, at least in part, to track and surveil Black and Latino neighborhoods as part of a gang enforcement strategy. This strategy has caused law enforcement actions against Black and Latino people in the Database, including without limitation stops, arrests, and prolonged interrogations, that do not occur against similarly-situated white people who are not in the Database.

420.`    Defendants do not subject similarly situated white individuals and neighborhoods to the same level of surveillance, harassment, and monitoring for inclusion on the Database and subsequent law enforcement actions as they do Black and Latino individuals and communities.

421.    Defendants have made express classifications on the basis of race, ethnicity, and/or national origin in their training materials and policies related to the Database and have made express classifications on the basis of race, ethnicity, and/or national origin in their determination of which purported groups merit inclusion in the Database.

422.    The NYPD enforces its policies and practices related to the Database in a racially-disparate manner. The NYPD surveils, harasses, arrests, detains, and unnecessarily extends stops and interrogations of Black and Latino people on the Database at disparately high rates, as compared to similarly situated white people who have not been placed on the Database.

423.   Defendants were and remain deliberately indifferent to the harm created through the implementation of the Database. Despite notice of racial disparities in the Database, Defendants' policies and practices concerning the Database remain unchanged.

424.   Defendants lack rational justification for the Database and the related policies and practices, let alone the compelling one required, nor are the Database and related policies and practices adequately tailored.

425.   Defendants' actions or inactions alleged herein have violated and continue to violate the Equal Protection rights of the Plaintiffs and the Plaintiff Class under the Fourteenth Amendment.

### COUNT II: Violation of State Constitution Right to Equal Protection
**N.Y. Const. Art. 1, § 11**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)**

426.   Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

427.   Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the Plaintiff Class to be free from unequal treatment under the law under Article 1, § 11 of the New York State Constitution.

**COUNT III: Violation of the Fourteenth Amendment Right to Due Process -- Vagueness**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants )**

428.    Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

429.    The Defendants' guidance and policies regarding the labeling of criminal groups, gangs, crews and their respective members and the policies regarding the entry of individuals onto the Database are impermissibly vague, thereby allowing the NYPD to enter people into the Database arbitrarily and impose the negative consequences inherent in such labeling and entry. The Defendants' guidance and policies 1) do not provide people of ordinary intelligence a reasonable opportunity to understand what conduct the policies prohibit and 2) authorize and encourage arbitrary and discriminatory enforcement.

430.    Defendants' actions or inactions alleged herein have violated and continue to violate the Due Process rights of the Plaintiffs and the Plaintiff Class under the Fourteenth Amendment.

**COUNT IV: Violation of State Constitution Right to Due Process**
**N.Y. Const. Art. 1, § 6**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)**

431.    Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

432.    Defendants' actions or inactions alleged herein have violated and continue to violate the due process rights of the named Plaintiffs and the Plaintiff Class under Article 1, § 6 of the New York State Constitution.

**<u>COUNT V: Violation of First Amendment Right to Free Speech, Expression, and Association</u>**
**U.S. Const. amend. I, 42 U.S.C. § 1983**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)**

433.    Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

434.    The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. The Supreme Court has also recognized a constitutionally protected freedom of association.

435.    The Defendants' policies and practices for populating, maintaining, and enforcing the Database punish, burden, and chill protected free speech, expression, and association, including in a manner that subjects Black and Latino individuals to differential treatment.

436.    Defendants' actions or inactions alleged herein have violated and continue to violate the free speech, expression, and association rights of the named Plaintiffs and the Plaintiff Class under the First Amendment..

**<u>COUNT VI: Violation of State Constitution Right to Free Speech, Expression, and Association</u>**
**N.Y. Const. Art. 1, § 8**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)**

437.    Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

438.    Defendants' actions or inactions alleged herein have violated and continue to violate the free speech, expression, and association rights of the named Plaintiffs and the Plaintiff Class under Article 1, § 8 of the New York State Constitution.

**COUNT VII: Excessive Detention In Violation of the Fourth Amendment**
**U.S. Const. amend IV; 42 U.S.C. § 1983**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)**

439.    Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

440.    By its policies and practices described herein, Defendants have repeatedly and continuously subjected Plaintiffs and class members to unreasonably delayed releases from custody resulting in unlawful, excessive, and unreasonably prolonged detention without justification under the Fourth Amendment. Plaintiffs have been subjected to such detention in a manner that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detention and after all tasks tied to the initial justification for detention, if any, are—or reasonably should have been—completed.

441.    Plaintiffs and class members have been subjected to this excessive detention pursuant to the official policies, customs, or practices of Defendant City of New York which instruct officers to detain people on the Database for longer than would otherwise be required for the purpose of unrelated debriefing.

**COUNT VIII: Excessive Detention in Violation of State Constitution**
**N.Y. Const. Article I, § 12**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)**

442.    Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

443. Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the Plaintiff Class to be free from unreasonable seizures under Article 1, § 12 of the New York State Constitution.

**Count IX: Violation of the Prohibition of Biased-Based Policing**
**New York City Administrative Code § 14-151**
**(All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants)**

444. Plaintiffs incorporate and reallege each and every allegation contained above as if fully set forth herein.

445. The official policies and practices through which the Database is populated, maintained, and enforced have discriminated on the basis of race, ethnicity, and/or national origin and have the effect of bias-based profiling.

446. Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiff and the Plaintiff Class under the Administrative Code § 14-151, prohibiting bias-based profiling.

**JURY DEMAND**

447. Plaintiffs demand trial by jury in this action on their claims seeking money damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the putative class they seek to represent, request that this Court grant the following relief:

104 of 107

a. Issue an Order certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and(b)(2) in the manner described above herein, with Plaintiffs 1-3 as class representatives;

b. Issue a class-wide judgment declaring that the Database and subsequent law enforcement actions based on the Database, and all related policies, practices, customs and conduct of Defendants, as described in this Complaint, constitute violations of the rights of Plaintiffs and the class they represent under the United States Constitution; in that the NYPD's policies, practices, customs, and conduct violates the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the New York Constitution and the New York City Administrative Code, and that Defendants' implementation, enforcement, and sanctioning of these policies practices, customs, and conduct by NYPD officers, and their deliberate indifference to the consequent harms, directly and proximately causes injuries to Plaintiffs and the class they represent;

c. Issue an order for the following injunctive relief:

> A permanent injunction preventing Defendants from: maintaining the Database; allowing any officer to access information that is or was in the Database through DAS or any other system; enforcing the policies associated with the Database; implementing the Database; using information currently stored on the Database for any purpose, including but not limited to conducting or extending a stop or to enhance any criminal charge or penalty; adding any person to the Database in the future; or reconstituting a Database using substantially similar criteria for similar law enforcement purposes; creating a similar database using the same or similar criteria for the same or similar law enforcement purposes; and requiring that Defendants remove from the Database all people currently, or in the past, designated as Criminal Group members or associates, whether characterized as "Active" or "Inactive."

**d.** Award named Plaintiffs Adam, Bryan, and Chris compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

**e.** Award named Plaintiffs Adam, Bryan, and Chris damages against Defendants Commissioner Tisch, Chief Kenny, and Assistant Chief Hart to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

**f.** Award all Plaintiffs, including the members of the class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

**g.** Award all Plaintiffs, including the members of the class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

**h.** Allow such other and further relief as the Court deems appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

## <u>DESIGNATION PLACE OF TRIAL</u>

Plaintiffs designate Brooklyn, New York as the place of trial for this action.


DATED this 30th day of April, 2025.          Respectfully submitted,


Kevin E. Jason                    Philip Desgranges
Elizabeth G. Caldwell             Rigodis Appling
Lauren Carbajal**                 Alexandra Ogunsanya***
Alexsis M. Johnson*               THE LEGAL AID SOCIETY
Catherine Logue                   49 Thomas St, 10th Fl.

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
(212) 965-2200
kjason@naacpldf.org
bcaldwell@naacpldf.org
lcarbajal@naacpldf.org
amjohnson@naacpldf.org
clogue@naacpldf.org

Anne Venhuizen
Isabel Bolo
THE BRONX DEFENDERS
360 East 161st St.
Bronx, NY 10451
(718) 838-7878
annev@bronxdefenders.org
ibolo@bronxdefenders.org

Marjorie J. Peerce
Samuel J. Erlanger*
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200
peercem@ballardspahr.com
erlangers@ballardspahr.com

Christopher A. Hatfield**
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
(202) 661-2200
hatfieldc@ballardspahr.com

New York, NY 10013
(212) 577-3398
pdesgranges@legal-aid.org
rtappling@legal-aid.org
aogunsanya@legal-aid.org

Andrew Case
Mariana Camilla Lopez*
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 219-3360
acase@latinojustice.org
mlopez@latinojustice.org

Samhitha M. Medatia**
BALLARD SPAHR LLP
999 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
(678) 420-9300
medatias@ballardspahr.com

Marcel S. Pratt**
Katherine L. Oaks**
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
prattm@ballardspahr.com
oaksk@ballardspahr.com

*Application for admission pending or
forthcoming
**Pro Hac Vice motion forthcoming
***Law Graduate pending admission