UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
Plaintiffs 1-3, on behalf of themselves and all   :
others similarly situated,                               :
                                         :
                    Plaintiffs,     :
                              :
        - against -            :
                              :
                              :
THE CITY OF NEW YORK; JESSICA S.    :
TISCH, Police Commissioner for the City of  :
New York, in her official capacity; JOSEPH  :
KENNY, Chief of Detectives for the New   :
York City Police Department, in his official  :
capacity; and JOHN HART, Assistant Chief  :
of Intelligence for the New York City Police  :
Department, in his official capacity,      :
                              :
                    Defendants.    :
--------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

25-cv-2397 (BMC)

**COGAN**, District Judge.

Plaintiffs 1, 2, and 3, who refer to themselves by the pseudonyms Adam Anderson, Bryan Bradley, and Chris Cooper, bring this putative class action against the City of New York (the "City") and NYPD officials "to end the [NYPD's] unconstitutional practice of disparately criminalizing and targeting tens of thousands of Black and Latino New Yorkers by placing their names in the Department's Criminal Group Database." Plaintiffs bring claims for violations of their First, Fourth, and Fourteenth Amendment rights and their parallel rights under the New York State Constitution, and for violation of the New York City Administrative Code's prohibition against bias-based profiling.

Before the Court are plaintiffs' motion for class certification and motion to proceed anonymously, which they filed contemporaneously with their complaint, and defendants' motion

to dismiss.  For the reasons set forth below, plaintiffs' motion for class certification is denied without prejudice to renewal after completion of limited discovery; defendants' motion to dismiss is granted only as to the individual defendants and is otherwise denied; and plaintiffs' motion to proceed anonymously is denied.

## SUMMARY OF COMPLAINT

### I.     The Criminal Group Database

Since at least 2013, the NYPD has used a centralized, electronic database known as the Criminal Group Database (the "Database") to label, track, and monitor alleged "gang" and "crew" members.  Plaintiffs believe that the Database is simply a new and expanded iteration of the NYPD's "stop and frisk" policy.

In 2013, a federal court held that the NYPD's use of stop and frisk violated the Fourth and Fourteenth Amendment rights of Black and Hispanic New Yorkers.[1]  The court ordered sweeping reforms which, over the next few years, resulted in a 74.6% decrease in recorded stops. During roughly that same period, however, the number of people whom the NYPD entered into the Database as "active" crew or gang members increased by a similar margin, with 99% of those added being Black or Latino.[2]

The New York City Council held a hearing in June 2018 after the NYPD's Database statistics became public.  The NYPD Chief of Detectives testified that the NYPD tracked 17,500 people as "active" criminal group members on the Database and that the "racial breakdown" of the "active" list was "extremely disparate."  A few months later, the Office of the Inspector

---

[1] That case is Floyd v. City of New York, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).

[2] Plaintiffs explain that they use the term "Latino" except when they rely on data from the NYPD, the Census, or the American Community Survey, at which time they use the term "Hispanic."  As plaintiffs recognize, these terms are not interchangeable: "Hispanic" individuals originate from Spanish-speaking countries, whereas "Latino" individuals originate from Latin America.  Throughout this decision, the Court uses whichever term the parties use in that instance.

General for the NYPD ("OIG"), a watchdog agency responsible for investigating the NYPD's

policies and practices, launched an investigation into the Database.

In 2020, the City Council passed the Public Oversight of Surveillance Technology

("POST") Act, a transparency law requiring the NYPD to publish an "Impact and Use Policy"

for its surveillance technologies.  Pursuant to the POST Act, the NYPD published an Impact and

Use Policy for the Database in 2021 ("2021 IUP").  With its 2021 IUP, the NYPD disclosed the

following criteria that it used for entering individuals into the Database:

**Option A** (one of the following is required for entry):

(1) a self-admission of criminal group membership to a member of the NYPD; or social media posts admitting to membership in a criminal group, "such as language, symbols, picture[s], colors, etc[.] that are affiliated with a criminal group."

(2) a reasonable belief that a person is in a criminal group and that person is identified as a member of a criminal group by two independent and reliable sources (Ex. Precinct, Personnel, Intelligence, School Safety, Juvenile Justice, Detective Bureau, Dept of Corrections, Outside Agency).

**Option B** (at least two of the following are required for entry):

(1) frequent presence at a known criminal group location;

(2) possession of criminal group-related documents;

(3) association with known criminal group members;

(4) social media posts with known criminal group members while possessing known criminal group paraphernalia;

(5) scars and tattoos associated with a particular criminal group;

(6) frequent wearing of the colors and frequent use of hand signs that are associated with particular criminal groups; or

(7) other.

Option A(1) authorized the NYPD to enter an individual into the Database who admitted

that he or she was a member of a criminal group.  But the "self-admission category" was not

focused solely on explicit proclamations of gang membership.  Rather, a social media post containing certain indicia of gang membership – language, symbols, pictures, colors – could constitute a self-admission.  Under the category's broad language, even innocuous social media posts like "Happy birthday gang" were enough.

Option A(2) required that the officer recommending an individual for the Database have a "reasonable belief" that the individual was a member of a criminal group, and that two "independent and reliable sources" identify the individual as a member of a criminal group.  But nowhere did the NYPD set forth the nature and quantity of evidence sufficient to establish a "reasonable belief."  In addition, although the "two independent and reliable sources" were oftentimes also NYPD officers, they could have been non-law enforcement entirely.

Option B was a catchall category which required the presence of at least two indicia of criminal group affiliation from its list, one of which was simply, "other."  Plaintiffs describe several innocent activities that could have gotten someone added to the Database through Option B.  For example, frequenting a local bodega in a blue Yankees cap could have been enough if the NYPD considered the bodega a "known criminal group location" and considered blue to be a color associated with a "particular criminal group."

In April 2023, the OIG issued a report (the "OIG Report") following its investigation into the Database.  The OIG Report detailed "system-wide breakdowns and deficiencies with the NYPD's design and operation of the Database, including deficient policies for labeling someone as a member of a 'criminal group.'"  Among other things, the OIG Report criticized the activation criteria and the evidence that the NYPD relied on to add people to the Database, as well as the NYPD's documentation of that evidence.  For example, officers routinely provided no supporting information about Option A or Option B at all when recommending someone for

entry into the Database.  Instead, an officer might have included only a boilerplate statement such as "On [DATE], the undersigned is requesting [Name of Subject] be entered in as a [CRIMINAL GROUP] member."  The OIG Report recommended that the NYPD audit the Database to identify erroneous entries and provide guidance to officers on how to apply activation criteria.

The NYPD published another Impact and Use Policy for the Database in 2023 ("2023 IUP") after revising its criteria in response to the OIG's criticisms.  Option A remained the same in substance and Option B was eliminated.  However, the NYPD did not remove individuals from the Database who were previously entered based on Option B.  Additionally, the NYPD did not audit the Database to identify erroneous entries or provide officers with additional guidance or revised training about the activation criteria.

Plaintiffs allege that the NYPD uses these "vague" criteria to target Black and Latino people for inclusion in the Database and point to the "extreme racial disparities in the composition of the Database" as proof.  Between January 2014 and February 2018, nearly 99% of the 17,452 people whom the NYPD added to the Database as "active" gang or crew members were Black or Hispanic.  In December 2022, 99% of the "active" people listed in the Database were Black or Hispanic.  As of February 2025, Black and Hispanic people made up 98.58% of the "active" people listed in the Database and 96.84% of the "inactive" people listed in the Database.  Yet during all these time periods, Black and Hispanic people made up roughly half of New York City residents.

Further, the demographics of the Database are not necessarily consistent with the demographics of New York City criminal groups at large.  The NYPD has acknowledged that it "does not enter every person that fits the criteria" into the Database and, in fact, that appears to

be the case. Notably, criminal groups affiliated with whiteness, like Proud Boys, Maniac Murder Cult, and Patriot Front, as well as predominantly white criminal groups, like the Russian and Albanian criminal organizations, aren't included in the Database at all.

Plaintiffs then spotlight an NYPD PowerPoint training on identifying gang members which, like the Database's demographics, appears skewed. For one, this presentation notes that attending the Puerto Rican Day Parade and having "Mexican" tattoos may be evidence of gang affiliation; but, at least by plaintiffs' allegations, the presentation says nothing of white supremacist rallies or swastika tattoos. Additionally, every photo that the presentation uses for depicting indicators of gang membership – hand signals, dances, luxury clothing – is of a Black or Latino individual. And these photos (at least the ones plaintiffs explicitly describe) don't even depict criminals: they depict athletes and celebrities, like Serena Williams and Drake.

Finally, plaintiffs aver that the NYPD has a policy and practice of policing people on the Database more heavily and subjecting them to more police intrusions than people not on the Database. Plaintiffs explain how individuals in the Database are subjected to heightened surveillance, enforcement of low-level infractions (like littering and jay walking), and prolonged detentions and interrogations that don't match the underlying offenses. Although activation, renewal, and deactivation information for individuals in the Database is not accessible to everyone in the NYPD, all uniformed officers can access the "Domain Awareness System," which pulls one's gang or crew affiliation from the Database, and are trained to use the Domain Awareness System to search the name of every person they stop or arrest. In this way, all officers in the field are effectively using the Database as a tool for the performance of their duties. In addition, the NYPD shares gang affiliation from the Database with non-NYPD, including District Attorney's Offices, the New York City Departments of Correction and

Education, community leaders, civic organizations, the news media, and even the FBI and ICE. Thus, individuals in the Database are at risk not only for over-policing, but for a wide range of legal, reputational, and other harms.

## II.    Individual Plaintiffs

Individual plaintiffs in this action are Black men who claim that they are included in the Database as "active" or "inactive" criminal group members despite having never been affiliated with criminal groups. Plaintiffs each claim to have been targeted for surveillance and enforcement of low-level offenses, and state that their repeated interactions with the police have left them with significant emotional distress and lasting trauma.

### A.    Adam Anderson

Adam Anderson has been listed in the Database as an "active" member of the gang "Flocka Fam 900 Sumner Houses" since as early as 2015. Anderson's activation paperwork shows that he was entered into the Database based on both Option A and Option B criteria. Anderson maintains, however, that "Flocka Fam 900 Sumner Houses" is not a criminal group, and that he is not and never has been a member of any criminal group.

In September 2023, officers arrested Anderson for jaywalking. They first held him for over an hour at Public Service Area ("PSA") 3, then brought him to the 79th Precinct where gang detectives interrogated Anderson about matters unrelated to the jaywalking violation. Officers held Anderson in custody for roughly five hours before releasing him with a summons for jaywalking. The jaywalking charge was ultimately dismissed in December 2023. The NYPD has since arrested Anderson for jaywalking on additional occasions, including most recently in June 2024.

In February 2025, officers stopped a car in which Anderson was a backseat passenger for a traffic violation.  Officers removed Anderson, the driver, and two other passengers from the vehicle, then searched them, handcuffed them, and brought them to PSA 3.  Officers held Anderson for approximately one hour before releasing him with a traffic ticket for failing to wear a seatbelt.

Outside of the described instances, Anderson has been repeatedly stopped for low-level infractions and "quality-of-life offenses" (*e.g.*, jaywalking, littering, spitting in a trashcan, not wearing a seatbelt, hanging out near the playground in Sumner Houses), subjected to lengthy interrogations about matters unrelated to the stops, and released with a summons, ticket, or no charges at all.  Anderson believes that the NYPD is surveilling him, as even officers whom Anderson has never met will address him by name and call him a gang member.  Fearing further police harassment, Anderson limits public outings (particularly with his children), has distanced himself from his family and friends, and avoids driving because he is pulled over nearly every time he gets into his car.  Additionally, as a musician, Anderson refrains from writing music on topics which the NYPD might associate with gang affiliation, particularly because an officer once told one of Anderson's music collaborators that he was a gang member.

> B.    Bryan Bradley

Bryan Bradley is listed in the Database as an "inactive" member of the "Harbor Gang." Bradley was moved to "inactive" status in 2023 or 2024 after having been first entered into the Database as an "active" associate in 2017 and later upgraded to a member.  Bradley's activation paperwork shows that he was entered into the Database based on Option B criteria.  Bradley maintains, however, that "Harbor Gang" is not a criminal group, and that he is not and never has been a member of any criminal group.

Bradley first learned that he had been affiliated with "Harbor Gang" in 2019, when a relative saw his picture on a bulletin board outside the 121st Precinct depicting "Harbor Gang" members.  Bradley then moved to North Carolina to avoid being targeted by the NYPD.

Bradley returned to Mariner's Harbor in February 2023 after the death of his father.  Shortly after his return, officers spotted him at a corner store then pulled him over when he began driving away.  The officers asked for his license and informed him that he was not supposed to park in front of the store.  The officers then brought Bradley to the 121st Precinct and held him in a cell for hours before interrogating him about unrelated matters.  They eventually released him with a ticket for aggravated unlicensed operation of a motor vehicle.

In April 2024, officers stopped a car in which Bradley was a backseat passenger.  They ordered every passenger out of the vehicle and demanded Bradley's identification, then singled him out for a pat-down and search.  The officers claimed that the vehicle was parked near a fire hydrant.  The officers held Bradley in the middle of the street for roughly an hour.

In June 2024, Bradley brought his newborn daughter to a community event known as "Family Day."  Bradley noticed an NYPD patrol car circling the area, so he decided to take his family home.  Shortly after Bradley and his family got into the car, officers made a U-turn in their direction.  Bradley pulled over to let the officers pass, but the officers instead pulled him over and approached the car.  The officers told Bradley that he had failed to properly signal when pulling over to let them pass.  The officers placed Bradley under arrest, confiscated the car, and left Bradley's daughter and her mother on the sidewalk.  The officers then brought Bradley to the 121st Precinct and held him in a cell for roughly three hours before interrogating him about unrelated matters.  They eventually released him with a ticket for aggravated unlicensed operation of a motor vehicle.

Outside of the described instances, Bradley has been repeatedly stopped for low-level offenses and traffic infractions, subjected to lengthy interrogations about matters unrelated to the stops, and released with an appearance ticket, traffic ticket, or no ticket at all.  Bradley also notes that he has been stopped in the absence of any violation at all.  In one instance, officers pulled Bradley over for a broken license plate light and broken brake light, but when Bradley checked for himself, both lights were working.  Further, in recent years, officers have pulled Bradley over nearly every time he has driven his cousin to the ferry for work.  Bradley no longer feels free to move about Mariner's Harbor or attend community events.  To avoid reactivation of his criminal affiliation status, he stays home as much as possible and avoids spending time with people from the neighborhood.

       C.     <u>Chris Cooper</u>

Chris Cooper is listed in the Database as an "active" member of "a purported group that shares the name of a popular song."  Cooper's activation paperwork shows that he was entered into the Database based on both Option A and Option B criteria.  Cooper maintains, however, that he is not and never has been a member of a criminal group, and that he does not believe that the phrase is associated with a criminal group.  He believes that he was added to the Database when he was falsely accused of attempted murder.  He spent two years incarcerated on Rikers Island while awaiting trial before he was ultimately acquitted of all charges.

In 2017, police officers stopped Cooper on two occasions.  In the first instance, Cooper was driving his girlfriend to a party when officers pulled him over.  The officers asked for Cooper's license and, after running his name through a device, remarked that Cooper was in a gang.  The officers then told Cooper to leave.

In the second instance, Cooper was a passenger in a car when police pulled him over. The officers stated that the car smelled like marijuana, asked Cooper and the driver to exit the vehicle, and searched the vehicle with their consent.  The officers determined that Cooper was in the Database after running his name through a device, so they called a supervisor.  They then searched Cooper's pockets – not the driver's – and found a pocketknife.  They arrested Cooper, kept him in custody for twelve hours, and charged him with possession of a weapon.  The charge was ultimately dismissed.  Plaintiff believes that he was stopped, searched, and arrested pursuant to the City's policies concerning individuals in the Database.

Cooper grew up at Gowanus Houses and continues to have significant ties to the neighborhood, but now generally avoids the area since Gowanus Houses is a "known criminal group location."  When he visits his grandfather who still lives there, he does so only during the day and if he has his car.

\* \* \*

Plaintiffs bring nine causes of action.  As Counts I and II, plaintiffs bring claims for violation of the Fourteenth Amendment's Equal Protection Clause under § 1983 and violation of the analogous provision of the New York Constitution, Article 1 § 11, arguing that defendants have a policy of using discriminatory policing tactics to target Black and Latino individuals for inclusion in the Database and for subsequent law enforcement actions.  As Counts III and IV, plaintiffs bring claims for violation of the Fourteenth Amendment's Due Process Clause under § 1983 and violation of the analogous provision of the New York Constitution, Article 1 § 6, arguing that defendants' guidance and policies regarding the labeling of criminal groups and their members and regarding the entry of individuals into the Database are impermissibly vague.  As Counts V and VI, plaintiffs bring claims for violation of the First Amendment under § 1983 and

11

violation of the analogous provision of the New York Constitution, Article 1 § 8, arguing that defendants' policies and practices concerning the Database chill free speech, expression, and association, including in a manner that subjects Black and Latino individuals to differential treatment.  As Counts VII and VIII, plaintiffs bring claims for violation of the Fourth Amendment under § 1983 and violation of the analogous provision of the New York Constitution, Article 1 § 12, arguing that defendants have repeatedly subjected them to unreasonably prolonged detentions without justification pursuant to the City's policy of detaining people on the Database for longer than required for the purpose of interrogating them on unrelated matters.  Finally, as Count IX, plaintiffs bring a claim for biased policing in violation of the New York City Administrative Code § 14-151.

Plaintiffs seek compensatory damages for the individual plaintiffs and injunctive relief for the class, the latter which would, among other things, require defendants to shut down the Database.  Plaintiffs also seek a judgment declaring that the Database, its policies, and subsequent law enforcement actions violate the U.S. Constitution, the New York Constitution, and the New York City Administrative Code and caused injuries to plaintiffs.

## DISCUSSION

### I.      Motion for Class Certification

Plaintiffs seek to certify the following class pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure: "All Black and Latino people who have been, or will be, labeled as a member of a 'crew,' 'gang,' or 'criminal group,' and entered into the NYPD's Criminal Group Database."  Plaintiffs also seek to have their counsel appointed to represent the class.

To certify a class, plaintiffs "must meet both the requirements for the particular relief, injunctive or monetary, sought under [Rule 23(b)(2) or Rule 23(b)(3)], as well as the threshold requirements for class certification under Rule 23(a)," before a class action may be certified. Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 80 (2d Cir. 2015). Rule 23(a) has four requirements: numerosity, commonality, typicality, and adequacy of representation. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011). These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." Id. (internal quotation marks and citations omitted). If the Rule 23(a) requirements are met, a Rule 23(b)(2) class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010). As the Supreme Court has made clear, "Rule 23 does not set forth a mere pleading standard." Wal-Mart, 564 U.S. at 350. Rather, plaintiffs "must affirmatively demonstrate [their] compliance with the Rule – that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Id. (emphasis in original). Indeed, "certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Id. at 350-51 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)).

A.    Rule 23(b)(2)

The Court starts with Rule 23(b)(2) because defendants' challenge there implicates standing, which is the threshold matter to all issues. A plaintiff "must demonstrate standing for

13

each claim and form of relief sought." <u>Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs.</u>, 145 F.4th 212, 225 (2d Cir. 2025) (quoting <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 404 (2d Cir. 2011)).  Because plaintiffs seek certification of a Rule 23(b)(2) or "injunctive relief" class, plaintiffs must establish standing to seek injunctive relief by showing that they "[have] sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct."  <u>See</u> <u>Shain v. Ellison</u>, 356 F.3d 211, 215 (2d Cir. 2004) (quoting <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101-02 (1983)). Defendants argue that plaintiffs have not satisfied either requirement for injunctive relief standing.

First, defendants argue that plaintiffs have not demonstrated a likelihood of future harm. They compare the instant case to <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105 (1983), in which the Supreme Court held that the plaintiff, who had been subjected to a dangerous chokehold by a police officer, did not have standing to pursue an injunction against the police department's practice of using chokeholds.  The Supreme Court reasoned that plaintiff's past injury "[did] nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."  <u>Id.</u>  Defendants boil down <u>Lyons</u> (and certain of its district court progeny) to the proposition that "the likelihood of future unconstitutional treatment by the police in the course of a detention or arrest is too speculative to confer standing."

But defendants misconstrue the harms that plaintiffs allege.  Unlike the plaintiff in <u>Lyons</u>, who was subjected to a single dangerous chokehold by the police, plaintiffs Anderson and

Bradley[3] recount repeated instances where the police stopped them for petty violations (jaywalking, not wearing a seatbelt, parking in a "no parking" zone, failing to signal when letting a police car pass) and, upon discovering that plaintiffs were in the Database, detained them for much longer than the violations warranted and interrogated them on matters unrelated to the violations. Anderson and Bradley further aver that once officers learned that they were in the Database, officers subjected them to heightened surveillance and targeted them for further detentions and interrogations for petty violations and even for non-violations, like spitting in a trashcan, hanging out by a community playground, and publicly gathering with friends and family.

"The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." Floyd, 283 F.R.D. at 169 (citation omitted). The likelihood that plaintiffs will be wrongfully targeted by the police is grounded in both their prior confrontations with the police and an ongoing NYPD practice of, *inter alia*, targeting individuals in the Database for increased surveillance, stops and detentions for low-level violations and quality-of-life offenses, and interrogations unrelated to those stops. And for what it's worth, Anderson and Bradley cannot avoid further injury by simply "following the law," given that they've been stopped and interrogated for lawful activities like spitting in a trashcan and hanging out with family members in public. See id. at 170. So long as the Database exists and so long as plaintiffs are in it, it is plausible that they will continue to be harmed by the police.

---

[3] The Court is skeptical as to whether Cooper has demonstrated standing to seek injunctive relief. The police stopped Cooper only twice. Additionally, the stops do not appear to have been based on his inclusion in the Database (notwithstanding Cooper's contention to the contrary) and, in the first instance, he was released shortly after the stop with no consequences. That being said, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Floyd v. City of New York, 283 F.R.D. 153, 169 (S.D.N.Y. 2012) (quoting Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 53 n.2 (2006)). Therefore, the Court focuses its standing analysis on Anderson and Bradley.

Second, defendants argue that plaintiffs have not identified "any current municipal policy or practice by which Black and Hispanic individuals are discriminated as a result of their entry into the Database to the exclusion of white individuals." Defendants are wrong: the complaint plainly challenges the NYPD's policies for creating, maintaining, and enforcing the Database as discriminatory against Black and Hispanic individuals. If defendants' point is that the NYPD does not have a policy that explicitly directs officers to target Black and Hispanic people for entry into the Database or for enhanced policing as a result of their inclusion in the Database, that point is not well taken. Certainly defendants know that a facially race-neutral policy applied in an intentionally discriminatory manner can give rise to an Equal Protection violation. See Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000). If defendants' point is that plaintiffs have not *proved* that these alleged policies are unconstitutional as written or applied or that plaintiffs have suffered harms because of these policies, that point is also not well taken. Whether plaintiffs will ultimately be able to prevail on the merits is irrelevant to the standing calculus.

Finally, the Court disagrees with defendants that plaintiffs' claim presupposes that no individuals in the Database are gang members and that injunctive relief requires that all members be aware of their inclusion in the Database. With respect to the former argument, defendants seem to believe that criminals' rights cannot be violated; they're obviously wrong. With respect to the latter argument, defendants offer no caselaw showing that one must subjectively fear a future harm in order to claim a real and immediate threat of future harm – nor could they. The Rule 23(b)(2) class action vehicle is premised on the idea that not all class members can or will vindicate their rights. Here, it is entirely conceivable that individuals could be experiencing harms like plaintiffs' because of their inclusion in the Database yet not know the cause.

16

Plaintiffs have therefore established standing to seek injunctive relief.

B.      Rule 23(a)

In their opposition, defendants do not offer any evidence or argument challenging the four threshold requirements of Rule 23(a).  However, a few weeks after the motion for class certification was fully briefed, defendants filed a letter requesting that the Court "hold its decision on plaintiffs' motion for class certification in abeyance pending the resolution of plaintiffs' motion to proceed anonymously and afford defendants an opportunity to conduct limited, and narrowly tailored class certification-related discovery."  Defendants explained that such discovery would be "primarily aimed at challenging the class representatives' adequacy to represent the class."  Defendants should have raised this issue in opposition to plaintiffs' motion or in a separate motion.  Even so, it is within the Court's discretion to "delay a certification ruling until information necessary to reach an informed decision is available," Dupres v. Houslanger & Assocs. PLLC, No. 19-cv-6691, 2020 WL 13158662, at *2 (E.D.N.Y. July 23, 2020) (citation omitted), and right now, the Court does not have enough information to make that decision.

"[T]here can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery ... to determine whether the prerequisites of Rule 23 are satisfied."  Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571 (2d Cir. 1982).  "Indeed[,] a district court may be reversed for premature certification if it has failed to develop a sufficient evidentiary record from which to conclude that the requirements of numerosity, typicality, commonality of question, and adequacy of representation have been met."  Id.  Here, plaintiffs have offered compelling arguments that the four requirements of Rule 23(a) have been met and rely on various documents in support, including their own affidavits, various public records, and excerpted NYPD Database

training materials.  But for the Court to conduct the rigorous analysis required, it needs more, including but perhaps not limited to NYPD and Database records relating to Anderson, Bradley, and Cooper, and primary source material concerning the Database's composition.

Because "discovery is necessary to develop the factual allegations, and ... [n]either party's interests are properly served by determining class certification prior to the completion of the discovery process," Dupres, 2020 WL 13158662, at *3, the Court denies plaintiffs' motion for class certification without prejudice to renewal after the completion of limited discovery.

Notwithstanding, the Court is going to dispose of defendants' "ascertainability" argument now.  "Most circuit courts of appeals have recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an 'ascertainability' requirement."  In re Petrobras Sec., 862 F.3d 250, 264 (2d Cir. 2017) (cleaned up).  In the Second Circuit, ascertainability "requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  Id.; see, e.g., Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704, 716 (2d Cir. 2023) (finding that "all that [was] needed" to satisfy the ascertainability requirement was the timeframe and place in which a particular group was allegedly harmed).  "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." Petrobras, 862 F.3d at 270.

Defendants construe the ascertainability requirement as one of "administrative feasibility."  However, defendants are relying on outdated caselaw.  In Petrobras, the Second Circuit explicitly stated "that a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23," which "directs courts to weigh the competing interests inherent in any class certification decision."  Id. at 264, 268.  "The only

relevant inquiry is whether determinations as to class membership are 'objectively *possible*.'" Fikes Wholesale, Inc., 62 F.4th at 717 (quoting Petrobras, 862 F.3d at 270) (emphasis in original). The Court therefore rejects all of defendants' administrative feasibility arguments, which make up the bulk of their ascertainability challenge.

Moreover, the Court is dubious as to whether the ascertainability requirement applies to Rule 23(b)(2) class actions at all. As the Second Circuit explained, "the ascertainability requirement merely gives name to a particularly vexing type of class defect that would cause a proposed class to founder on the shoals of predominance, superiority, or both." Petrobras, 862 F.3d at 269 n.20. Accordingly, the ascertainability requirement is keyed to the language of Rule 23(b)(3), which provides for class certification when a court finds that "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphases added).

Assuming *arguendo* that the ascertainability requirement does, in fact, apply to Rule 23(b)(2) class actions, the Court finds that it is easily satisfied here. Plaintiffs seek to certify a class of "[a]ll Black and Latino people who have been, or will be, labeled as a member of a 'crew,' 'gang,' or 'criminal group,' and entered into the NYPD's Criminal Group Database." The criteria for membership – race, criminal label, and inclusion in the Database – are objective and the Database itself prescribes the boundaries. The Court is not concerned with the fact that the class includes Black and Latino people who "will be" but are not yet entered into the Database. Although Floyd was partly operating under an outdated understanding of the ascertainability requirement, its conclusion remains true: "It would be illogical to require precise ascertainability in a suit that seeks no class damages." 283 F.R.D. at 172.

19

* * *

The Court therefore denies plaintiffs' motion to certify the class without prejudice to renewal after completion of limited discovery. When defendants inevitably challenge that renewed motion, they should not rehash their challenges to injunctive relief standing or ascertainability, as the Court has already considered and rejected those challenges in this decision.

## II. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court must "constru[e] the complaint liberally, accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017) (quoting Chase Grp. All. LLC v. City of New York Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010)).

Defendants first argue that because plaintiffs "have only alleged class allegations, and as class certification must be denied, ... their [c]omplaint must be dismissed for failure to state a claim." Defendants direct the Court to the headings for plaintiffs' counts, which all include the parenthetical, "All Individual Plaintiffs on Behalf of the Plaintiff Class Against All Defendants." The Court is not going to dismiss this case based on plaintiffs' imprecise boilerplate. More importantly, the Court is not going to dismiss this case for failure to plead individual allegations when plaintiffs have *clearly pleaded* individual allegations. The complaint explicitly states that plaintiffs are seeking injunctive and declaratory relief "on behalf of themselves and a class of

similarly situated individuals," and contains, in defendants' own words, "detailed allegations" by the individual plaintiffs.  Plus, plaintiffs seek damages on behalf of only themselves. Defendants' first challenge is entirely meritless.

Next, defendants argue that Commissioner Tisch, Chief Kenny, and retired Assistant Chief Hart must be dismissed from this action because they were not personally involved in the alleged constitutional violations.  In opposition, plaintiffs clarify that this lawsuit is against defendants Tisch, Kenny, and Hart in their official capacities, and argue that they did not need to allege personal involvement.  Defendants respond that the individual defendants' inclusion in this lawsuit in their official capacities is redundant given that the City is a defendant.  Indeed, "courts in the Second Circuit routinely dismiss official capacity claims against municipal officials as duplicative of the claims against the municipality."  In re New York City Policing During Summer 2020 Demonstrations, 548 F. Supp. 3d 383, 409 (S.D.N.Y. 2021) (citing Phillips v. Cty. of Orange, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (collecting cases)).  Accordingly, because plaintiffs are suing the individual defendants in only their official capacities and because the City is already a defendant, the individual defendants are dismissed from this lawsuit.

Defendants then argue that plaintiffs' federal claims, even if considered separately from the class allegations, "must be dismissed for the same reason class certification pursuant to [Rule] 23(b)(2) must be denied – failure to demonstrate standing to seek injunctive relief."  The Court is not going to revisit this issue, having already decided that plaintiffs have demonstrated standing to seek injunctive relief by showing both a likelihood of future harm and the existence of an official policy or its equivalent.  See supra, Discussion, Section I.A.  For that reason, the Court need not address defendants' additional argument on the second element regarding failure to train.

21

Finally, defendants seek dismissal of the state law claims because there are no allegations that plaintiffs served notices of claim as required under New York General Municipal Law § 50-i(1) ("No action ... shall be prosecuted or maintained against a city ... unless a notice of claim shall have been made and served upon the city.").  Plaintiffs admit that they did not file notices of claim but argue that their claims fall under the "public interest" and "equitable relief" exceptions to the notice-of-claim requirement.

 The public interest exception is reserved for actions that "are brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group."  Scaggs v. New York Dep't of Educ., No. 06-cv-0799, 2007 WL 1456221, at *20 (E.D.N.Y. May 16, 2007) (quoting Mills v. Monroe County, 59 N.Y.2d 307, 311, 464 N.Y.S. 2d 709, 711 (1983)).  "In cases vindicating public rights, '[t]he interests in their resolution on the merits override the State's interest in receiving timely notice before commencement of an action.'"  Id. (quoting Mills, 59 N.Y.S. 2d at 311, 464 N.Y.S. 2d at 711 (collecting cases)).  Plaintiffs qualify for the public interest exception.  They "brought this case to vindicate a broad range of rights of Black and Latino New Yorkers under the New York Constitution and Administrative Code" and seek to certify an injunctive relief class for that purpose.

Plaintiffs also qualify for the equitable relief exception.  That exception applies "where the primary relief being sought is equitable in nature, and monetary damages are only incidental."  People United for Child., Inc. v. City of New York, 108 F. Supp. 2d 275, 301 (S.D.N.Y. 2000).  Although plaintiffs seek individual damages, plaintiffs affirm that "damages are subordinate to [their] larger goal" of ending the Database.

Defendants counter that the exceptions do not apply because plaintiffs "are clearly seeking more than equitable relief in their demand for damages."[4]  Plaintiffs admit as much, and neither party gives the Court reason to conclude that damages are more than incidental to plaintiffs' claims for equitable and declaratory relief.  Nor is plaintiff's request for relief, in defendants' words, "detailed as to the money damages claim."  After detailing the exact nature of declaratory and injunctive relief sought, plaintiffs request compensatory damages "in amounts that are fair, just and reasonable."  This catchall request can hardly be considered "detailed."

In addition, although defendants attempt to blur the lines between the exceptions (*e.g.*, "while plaintiffs are seeking to vindicate a 'public interest,' they are clearly seeking more than equitable relief"), the public interest exception and equitable relief exception are separate.  Even if defendants were right that plaintiffs were seeking monetary damages more than incidentally, only the equitable relief exception would be rendered inapplicable, not the public interest exception.

In sum, the Court grants defendants' motion to dismiss defendants Tisch, Kenny, and Hart, and denies the motion on every other ground.

### III.    Motion to Proceed Anonymously

Plaintiffs filed their motion to proceed anonymously contemporaneously with the complaint, explaining that without anonymity, they "worry they will not be able to protect themselves and their families from physical and emotional harm, retaliation, and stigmatization resulting from this litigation."  Cooper adds that he "hesitate[s] to be named as a plaintiff of this litigation should [his] identity be revealed."

---

[4] Defendants also explain that the exceptions do not apply when a plaintiff seeks to vindicate a private right. However, defendants do not then argue that plaintiffs here seek to vindicate private rights.  In fact, in the next paragraph of their motion, defendants admit that plaintiffs "are seeking to vindicate a 'public interest.'"

In general, "[t]he title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). This "seemingly pedestrian" requirement "serves the vital purpose of facilitating public scrutiny of judicial proceedings and therefore cannot be set aside lightly." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 188 (2d Cir. 2008); see also Doe v. Shakur, 164 F.R.D. 359, 361 (S.D.N.Y. 1996) ("Indeed, lawsuits are public events and the public has a legitimate interest in knowing the facts involved in them. Among those facts is the identity of the parties." (internal quotation marks and citation omitted)). Although granting anonymity is within a court's discretion, Shakur, 164 F.R.D. at 360, "pseudonyms are the exception and not the rule, and in order to receive the protections of anonymity, a party must make a case rebutting that presumption," United States v. Pilcher, 950 F.3d 39, 45 (2d Cir. 2020).

"[W]hen determining whether a plaintiff may be allowed to maintain an action under a pseudonym, the plaintiff's interest in anonymity must be balanced against both the public interest in disclosure and any prejudice to the defendant." Sealed Plaintiff, 537 F.3d at 189. In Sealed Plaintiff, the Second Circuit identified ten non-exclusive factors for courts to balance when ruling on a motion to proceed anonymously:

> (1) whether the litigation involves matters that are highly sensitive and of a personal nature;
>
> (2) whether identification poses a risk of retaliatory physical or mental harm to the party seeking to proceed anonymously or even more critically, to innocent non-parties;
>
> (3) whether identification presents other harms and the likely severity of those harms, including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity;
>
> (4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure, particularly in light of his age;
>
> (5) whether the suit is challenging the actions of the government or that of private parties;

(6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court;

(7) whether the plaintiff's identity has thus far been kept confidential;

(8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity;

(9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities; and

(10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff.

Id. at 189-90 (cleaned up).  "[A] district court is not required to list each of the factors or use any particular formulation as long as it is clear that the court balanced the interests at stake in reaching its conclusion."  Id. at 191 n.4.

A.    Factor One: Matters of a Highly Sensitive and Personal Nature

The first factor considers whether the litigation involves highly sensitive, personal matters.  Id. at 190.  Plaintiff conflates this factor, which focuses purely on the nature of the claims, with factors two and three, which relate to the harms that would result from revealing one's identity.  Whether being publicly identified as being included in a challenged gang member database could lead to legal, social, and economic stigmatization or subject them to a greater risk of harassment, retaliatory threats, and physical danger is irrelevant as to whether the title of "gang member" is a highly sensitive, personal matter.  As to the latter question, the Court concludes that the answer is no.

Purported gang affiliation is not one of the matters that the courts have recognized as highly sensitive and personal.  See, e.g., Doe v. Alexander, No. 25-cv-2077, 2025 WL 1637941, at *2 (S.D.N.Y. June 9, 2025) (finding that a sexual assault case was "perhaps the quintessential

25

example of a claim involving 'highly sensitive' matters of a 'personal' nature"); <u>Michael v. Bloomberg, L.P.</u>, No. 14-cv-2657, 2015 WL 585592, at *3 (S.D.N.Y. Feb. 11, 2015) (finding that this was not "the type of unusual case involving matters of a highly sensitive or personal nature – *i.e.,* claims involving sexual orientation, pregnancy, or minor children"). Additionally, that something is negative or undesirable does not make it highly sensitive or personal. A gang member may not want police to know about that fact, but no one can reasonably argue that the fact of one's gang affiliation ought to be kept private. Such an argument is even weaker for plaintiffs, who claim to have been wrongly identified as gang members: they cannot reasonably argue that a falsehood is personal to them.

Finally, the Court rejects plaintiffs' arguments that if their identities were revealed, "the Federal Government could theoretically threaten individuals in the Database with deportation or other enforcement actions without due process." Although this argument is better suited to factors two and three, the Court disposes of it here. There are no allegations whatsoever concerning plaintiffs' immigration status, so this argument is irrelevant. In the Court's view, plaintiffs raise this argument solely to connect their case to the deportation-related cases they've cited in which anonymity was granted, *e.g.*, <u>Does I thru XXIII v. Advanced Textile Corp.</u>, 214 F.3d 1058, 1071 (9th Cir. 2000), and <u>Lozano v. City of Hazleton</u>, 496 F. Supp. 2d 477 (M.D. Pa. 2007). Besides, this argument is a *non sequitur*: the Court does not see how the disclosure of *plaintiffs'* identities would lead to the federal government threatening *other* individuals in the Database with deportation.

Factor one thus weighs against granting plaintiffs' motion.

B.    Factors Two and Three: Risk of Physical Retaliation or Mental Harm and
Likelihood and Severity of the Harm

The second and third factors consider the potential risks of disclosing the plaintiffs'

identities, specifically "whether disclosure of the plaintiff[s'] name[s] in the course of the lawsuit

would uniquely cause harm and how grave the resultant harm would prove to be."  Doe v.

Alexander, No. 25-cv-1631, 2025 WL 784913, at *3 (S.D.N.Y. Mar. 12, 2025) (internal quotation

marks and citations omitted).  Plaintiffs argue that disclosure of their identities "poses

detrimental imminent risk of retaliatory physical and mental harm to [them] and to innocent non-

parties."  In support, they recount the harassment and surveillance they have already experienced

by the NYPD (by virtue of being in the Database) and resulting mental and emotional harms

they've endured.  Presumably, the Court is meant to infer that such harms will worsen if

plaintiffs' identities are revealed, but plaintiffs do not say this outright.  What plaintiffs do say is

that disclosing their identities would "increase the likelihood of the NYPD inflicting further

harm on [their] family and friends."

On the one hand, assuming that plaintiffs' allegations are true, it is "logical to conclude at

this early stage" that disclosure of plaintiffs' identities *could* exacerbate "the precise harm th[is]

litigation seeks, in part, to redress."  Cf. Doe 11 v. Jarecki, No. 24-cv-4208, 2024 WL 2946058,

at *2 (S.D.N.Y. June 11, 2024) (citation omitted) (finding that the third factor weighed in the

plaintiff's favor because it was logical to conclude that disclosure of the plaintiff's identity *would*

cause the precise harm that the litigation sought to redress).  If police officers have been

wrongfully targeting plaintiffs up to this point, it's at least conceivable that they'll target

plaintiffs more aggressively in retaliation for plaintiffs' lawsuit.

On the other hand, however, plaintiffs have not established "with sufficient specificity the

incremental injury that would result from disclosure of [their] identit[ies]."  Alexander, 2025 WL

784913, at *3 (quoting <u>Doe v. Freydin</u>, 21-cv-8371, 2021 WL 4991731, at *2 (S.D.N.Y. Oct. 27, 2021)). Specifically, plaintiffs have not offered facts which would show that they will face different or greater harms if their identities are disclosed than they face now. Plaintiffs have alleged past harms due to their inclusion in the Database, but they have not alleged past retaliation for any "public actions [or] advocacy involved in this case" or "detailed a likelihood of retaliation due to disclosure specifically. See <u>Doe v. Salina</u>, No. 23-cv-3529, 2024 WL 1259362, at *5 (E.D.N.Y. Mar. 25, 2024).

Lastly, the Court considers plaintiffs' arguments which they incorrectly slated under factor one: that revealing their identities and, in turn, their false gang affiliations, could lead to "economic and social consequences including access to housing, education, and employment." Anderson has alleged that he lost economic and employment opportunities because of his fear of police harassment, but he has not established or alleged that disclosure of his identity would enhance these harms or cause new harms; that goes for the other plaintiffs as well. In fact, to the extent that this lawsuit allows plaintiffs to "correct the record," it seems that disclosure of their identities could actually help them. There are at least equal possibilities of harm and rectification through disclosure of their identities, such that this particular fact does not weigh for or against anonymity. And for what it's worth, "courts consistently reject requests [for anonymity] based on reputational harm or economic interests." See <u>Doe v. Brown Harris Stevens Residential Mgmt., LLC</u>, No. 25-cv-6194, 2025 WL 3154816, at *4 (S.D.N.Y. Nov. 10, 2025) (citations omitted).

The Court does not intend to minimize plaintiffs' worries, but there's reason to think that disclosing plaintiffs' identities may provide them with an added layer of protection from the alleged police harassment. Plaintiffs can be assured that under this Court's supervision, there

28

will be severe consequences for the City if its police officers engage in any action that would substantiate plaintiffs' fears regarding retaliatory conduct. In light of all these considerations, factors two and three weigh against granting plaintiffs' motion.

### C. Factor Four: Vulnerability and Age of Plaintiffs

Factor four considers "whether the plaintiff is particularly vulnerable to the possible harms of disclosure ... particularly in light of his age." Sealed Plaintiff, 537 F.3d at 190. Plaintiffs are adults, and they have not identified any reason for the Court to treat them as more vulnerable than the great run of adult plaintiffs who bring lawsuits against the City. Understandably, plaintiffs worry about their minor children. However, their children are not parties to this action and so their names will not be disclosed. Factor four thus weighs against granting plaintiffs' motion.

### D. Factor Five: Government or Private Actor

The fifth factor considers "whether the suit is challenging the actions of the government or that of private parties." Id. at 190. Because plaintiffs are challenging the actions of the government in a putative class action seeking injunctive relief, this factor facially favors plaintiffs:

> [W]here a plaintiff attacks governmental activity, for example a governmental policy or statute, the plaintiff's interest in proceeding anonymously is considered particularly strong. In such circumstances the plaintiff presumably represents a minority interest (and may be subject to stigmatization), and there is arguably a public interest in a vindication of his rights. In addition, the government is viewed as having a less significant interest in protecting its reputation from damaging allegations than the ordinary individual defendant. Further, in a class action context challenging governmental action, the individual defendant's personal characteristics (such as credibility) are generally not in issue.

EW v. New York Blood Ctr., 213 F.R.D. 108, 111 (E.D.N.Y. 2003) (citations omitted); see also Doe No. 2 v. Kolko, 242 F.R.D. 193, 195 (E.D.N.Y. 2006) ("[A] challenge to governmental

policy ordinarily implicates a public interest and the government has less of a concern with protecting its reputation than a private individual.").

However, "courts have also determined that [suing the government] can weigh against the use of a pseudonym," Doe v. United States, 2017 WL 2389701, at *3, particularly when "the involvement of the government indicates that there is a public interest in the facts of the incident at issue as opposed merely to a public interest in knowledge of the manner in which the courts function in resolving disputes," Doe v. City of New York, 201 F.R.D. 100, 102 (S.D.N.Y. 2001).

On balance, factor five slightly weighs in plaintiffs' favor. Still, like all other factors, factor five is not dispositive: "the fact that a group of plaintiffs is suing the government or seeking to challenge a government policy does not, by itself, justify granting a motion to proceed anonymously because doing so would lead, inappropriately, to granting anonymity to any plaintiff suing the government to challenge a law or regulation." Plaintiffs #1-21 v. Cty. of Suffolk, 138 F. Supp. 3d 264, 275 (E.D.N.Y. 2015) (internal quotation marks and citation omitted).

E.    Factor Six: Prejudice to Defendants

Factor six considers "whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously." Sealed Plaintiff, 537 F.3d at 190. "In assessing whether such prejudice exists, courts 'examine the reputational damage to defendants, difficulties in conducting discovery, and fundamental fairness of proceeding anonymously.'" Doe v. Combs, No. 24-cv-8852, 2025 WL 950685, at *5 (S.D.N.Y. Mar. 28, 2025) (quoting Doe v. Townes, No. 19-cv-8034, 2020 WL 2395159, at *5 (S.D.N.Y. May 12, 2020)). Plaintiffs focus on the fact that there will be no reputational harm to the NYPD because their case is directed at NYPD in its official capacity, not at its individual officers. But defendants are not concerned with

reputational harm; rather, defendants are concerned with the discovery disadvantages they would face if plaintiffs were to proceed anonymously.

Defendants are right that allowing plaintiffs to proceed anonymously would result in "asymmetry in fact-gathering." Doe v. Combs, No. 23-cv-10628, 2024 WL 863705, at *4 (S.D.N.Y. Feb. 29, 2024). Plaintiffs purport to represent a class of Black and Latino people who are included in the Database and are challenging the constitutionality of the policies surrounding the Database. It therefore matters whether plaintiffs are, in fact, in the Database, and whether plaintiffs have, in fact, been subjected to heightened surveillance, enforcement of petty offenses, and prolonged detentions and interrogations (among other things) as a result of their inclusion in the Database. In sum, plaintiffs' "credibility and factual knowledge will likely play a key role in the outcome" of their claims, and so plaintiffs' identities "are of crucial importance to the [d]efendants in investigating and asserting defenses to [plaintiffs'] claims." Cnty. of Suffolk, 138 F. Supp. 3d at 276.

Moreover, without knowing plaintiffs' identities, defendants will be at a major disadvantage when they attempt to oppose plaintiff's renewed motion for class certification. Defendants are right that it is incredibly difficult to challenge class certification on adequacy grounds without knowing who the lead plaintiffs are. See id. ("[T]he Court finds that Defendants will clearly be prejudiced because they will not be able to engage in meaningful discovery on both the merits of the Plaintiffs' claims and whether the unnamed Plaintiffs will qualify as adequate representatives of the proposed class action.").

Factor six therefore weighs against granting plaintiffs' motion.

F.  Factor Seven: Status of Confidentiality in the Proceedings

Factor seven considers "whether the plaintiff's identity has thus far been kept confidential." Sealed Plaintiff, 536 F.3d at 190. Plaintiffs maintain, and defendants do not dispute, that plaintiffs have not revealed their identities to defendants or the public. Therefore, this factor weighs in plaintiff's favor.

G.  Factor Eight: The Public Interest

Factor eight considers "whether the public's interest in the litigation is furthered by requiring the plaintiff[s] to disclose [their] identit[ies]." Id. (internal quotation marks omitted). The Court doubts that there is great public interest in knowing the identities of these plaintiffs who, presumably, are typical New Yorkers. Cf. Doe v. Weinstein, 484 F. Supp. 3d 90, 97 (S.D.N.Y. 2020). But factor eight doesn't hinge on newsworthiness. Rather, by virtue of lawsuits being public events, the public presumptively "has a legitimate interest in knowing the facts involved in them," which includes "the identity of the parties." Shakur, 164 F.R.D. at 361. The public's interest is better understood as the benefit to the public. And here, the public is benefitted through disclosure of the plaintiffs' identities because such disclosure permits a fairer proceeding.

The Court rejects plaintiffs' argument that denying their anonymity would "discourage other similar plaintiffs impacted by the NYPD from challenging unlawful practices without fear of retaliation." Cooper has expressed that he would be hesitant to remain a plaintiff in this lawsuit if his identity were revealed; Anderson and Bradley have not expressed the same. Regardless, plaintiffs offer no reason to believe that "other similar plaintiffs impacted by the NYPD" would be discouraged from bringing such lawsuits, and certainly no reason to believe that other similar plaintiffs have reason to fear retaliation if they bring such lawsuits in their own

names.  Plaintiffs' unsupported argument is further belied by the fact that people regularly bring

charges of police misconduct against the City in their own names.  Factor eight thus weighs

against granting plaintiffs' motion.

H.      Factor Nine: Legal Nature of the Issues

Factor nine considers "whether, because of the purely legal nature of the issues presented

or otherwise, there is an atypically weak public interest in knowing the litigants' identities."

Sealed Plaintiff, 537 F.3d at 190.  Here, the issues are not purely legal.  Contrary to plaintiffs'

assertion otherwise, "constitutionality of police practice" is not a pure question of law.  Plaintiffs

have made allegations as to how the Database was created, how individuals are added to the

database, how police officers are trained with respect to the Database, and how plaintiffs

themselves have been targeted as a result of their inclusion in the Database.  After the dismissal

stage, the parties will need to determine whether any of these factual allegations bear out, which

is a necessarily fact-intensive inquiry.  The ninth factor thus weighs against granting plaintiffs'

motion.

I.      Factor Ten: Alternative Protections

Factor ten considers "whether there are any alternative mechanisms for protecting the

confidentiality of the plaintiff[s]."  Id.  Plaintiffs have not addressed the presence of alternative

mechanisms, even inadequate ones.  Defendants, on the other hand, note that plaintiffs can seek

"redactions to protect particularly sensitive information, or a protective order."  See Weinstein,

484 F. Supp. 3d at 98.  The Court agrees with defendants.  This factor therefore weighs against

granting plaintiffs' motion.

* * *

In sum, only factors five and seven weigh in favor of allowing plaintiffs to proceed anonymously in this matter; the remaining eight factors weigh against anonymity. The Court thus concludes that plaintiffs have failed to successfully rebut the presumption of public disclosure.

Individuals regularly file lawsuits against the City, NYPD officials, and even individual officers for police misconduct and do so in their own names. Plaintiffs have not demonstrated that they have any greater a need for anonymity than those many plaintiffs that have come before them. More importantly, plaintiffs have not "sufficiently demonstrated that [their] interest in anonymity outweighs the prejudice to [d]efendants and the customary and constitutionally-embedded presumption of openness in judicial proceedings." Alexander, 2025 WL 784913, at *5 (internal quotation marks omitted). Accordingly, the Court denies plaintiffs' motion to proceed anonymously.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is denied without prejudice to renewal after completion of limited discovery; defendants' motion to dismiss is granted only as to the individual defendants and is otherwise denied; and plaintiffs' motion to proceed anonymously is denied. Within seven days of this order, plaintiffs shall file an amended complaint with their true names.

**SO ORDERED.**

_Brian M. Cogan_

_____
U.S.D.J.

Dated: Brooklyn, New York
      December 29, 2025